# B

4

COMMONWEALTH OF MASSACHUSETTS

MIDDLESEX, ss.

SUPERIOR COURT
CIVIL ACTION NO.

---

JANE DOE and JOHN DOE, individually and as parents
and next friends of DOE CHILD, and DOE CHILD,

Plaintiffs

v.

DEBORAH HOLLY, DEBORAH BRESNICK,
INDIVIDUALLY AND IN HER CAPACITY AS ASSISTANT
PRINCIPAL OF THE GREEN MEADOW SCHOOL, DONNA
DANKNER, INDIVIDUALLY AND IN HER OFFICIAL
CAPACITY AS PRINCIPAL OF THE GREEN MEADOW
SCHOOL, ROBERT J. GERARDI, INDIVIDUALLY AND IN
HIS OFFICIAL CAPACITY AS SUPERINTENDENT OF THE
MAYNARD PUBLIC SCHOOLS, MAYNARD PUBLIC
SCHOOLS, AND TOWN OF MAYNARD,

Defendants

RECEIVED

10/4/2019

RECEIVED

---

## COMPLAINT AND JURY DEMAND

## PARTIES

1. Plaintiff Doe Child ("Doe Child"), is a minor child who attended the Maynard Public Schools, at the town's elementary school, the Green Meadow School, during the school years 2015-2016 and 2016-2017, and who now resides at ~~█████████~~ in Acton, Middlesex County, Massachusetts, with her parents.

2. Plaintiff Jane Doe ("Mother Doe"), is Mother of Doe Child and resides at ~~█████████~~ in Acton, Middlesex County, Massachusetts, with Doe Child and Father Doe.

3. Plaintiff John Doe ("Father Doe"), is Father of Doe Child and resides at ~~█████████~~ in Acton, Middlesex County, Massachusetts, with Doe Child and Mother Doe.

4. Defendant Deborah Holly ("Ms. Holly") was employed as a teacher in the Green Meadow School of the Maynard Public Schools, and on information and belief, now resides at 99 Boathouse Road, Groton, Middlesex County, Massachusetts.

5. Defendant Deborah Bresnick ("Ms. Bresnick") was employed as Assistant Principal at the Green Meadow School of the Maynard Public Schools, and on information and belief, now resides at 39 Larcridge Lane, Ashland, Middlesex County, Massachusetts.

6. Defendant Donna Dankner ("Ms. Dankner") was employed as Principal at the Green Meadow School of the Maynard Public Schools, and on information and belief, now resides at 5 Westminster Way, Westborough, Worcester County, Massachusetts.

7. Defendant Robert J. Gerardi ("Superintendent Gerardi") was employed as Superintendent of the Maynard Public Schools, and on information and belief, now resides at 256 West Avenue, Seekonk, Bristol County, Massachusetts.

8. Defendant Maynard Public Schools, a/k/a/ Maynard School District ("Maynard Public Schools" or "School District") is the public school district in and for the Town of Maynard, and its official business address is 3 Tiger Drive, Maynard, Middlesex County, Massachusetts.

9. Defendant Town of Maynard ("Town of Maynard") is a town in the Commonwealth of Massachusetts, and its official business address is Town Hall, 195 Main Street, Maynard, Middlesex County, Massachusetts.

## STATEMENT OF FACTS

10. Doe Child suffered numerous instances of bullying during her first and second grade years at the Green Meadow Elementary School, which she attended from September of 2015 through May of 2017. Beginning in 2015, Mother Doe and Father Doe made numerous reports to teachers, administrators including but not limited to each of the individually named Defendants. These reports were essentially and effectively ignored, as the issues raised in these reports were either unaddressed or improperly handled by the Defendants. After seeking repeatedly and unsuccessfully to get the Defendants to address their concerns, and to respond appropriately to correct the problems they had reported, Mother Doe and Father Doe filed a formal complaint, called "Statement of Concern," with the Department of Elementary & Secondary Education ("DESE"), on or around May 28, 2017. (*See attached* EXHIBIT A – Complaint of May 28, 2017).

11. During the 2016-2017 school-year, when Doe Child was in the second grade, matters grew much worse, especially beginning in the middle of the school year, in January of 2017, and from that time onward, continuing through May, one month before the end of that school-year, at which time Doe Child was effectively forced out of school and denied schooling for the final month of her second grade school-year.

12. On January 12, 2017, Doe Child's second grand classroom teacher Ms. Holly sent an email to Mother Doe, requesting to meet on January 17, 2017 to discuss Doe Child's alleged misbehavior at lunch time and stating she (Ms. Holly) would be having Doe Child and student G ("G") write a note of apology to Ms. LeBlanc (teacher's aide). Mother Doe responded and agreed to meet but clarified that she (Mother Doe) had spoken to Doe Child about the incident and that Doe Child confirmed that she had not been misbehaving.

13. On January 13, 2017, Ms. Holly sent an email to Mother Doe, disagreeing with Doe Child's version of events during lunch time. Mother Doe responded by thanking Ms. Holly and requesting to discuss the incident with Ms. LeBlanc as well.

14. On January 16, 2017, Mother Doe sent an email to Ms. Holly, asking for Doe Child's side of the story to be heard, since Doe Child refuted all the allegations about her alleged misbehavior at lunch time. Mother Doe expressed concern that Doe Child's love of school was being ruined by all the false allegations.

15. On January 23, 2017, Mother Doe sent an email to Ms. Bresnick, informing her that Doe Child was slapped in the face by a student B ("B"). Ms. Bresnick responded by stating that Doe Child had said nothing to her about the incident when Ms. Bresnick saw Doe Child that afternoon.

16. On January 24, 2017, Ms. Holly sent an email to Mother Doe, admitting that B had slapped Doe Child. Mother Doe responded and recited another incident that had happened on the bus that day in which a third grader was harassing Doe Child and calling her names.

17. On January 25, 2017, Ms. Holly sent an email to Mother Doe, stating that she (Ms. Holly) was certain that the child's bus driver would take care of the bus incident from the day prior. However, no further action was taken to address this incident on the bus, or to address the physical assault upon Doe Child by B on January 23, 2017.

18. On April 13, 2017, Ms. Holly sent an email to Mother Doe, stating that Doe Child was teasing a student named C ("C") during recess, and that she would be making Doe Child write a letter of apology and sending home a behavior form for Mother Doe to sign. Mother Doe responded to clarify that Doe Child did not tease C, but that in fact it was C himself who had been called Doe Child names, and that Ms. Holly had not given Doe Child a chance to tell her side of the story. Ms. Holly responded by stating that Doe Child was not innocent and all students involved were being punished. Mother Doe responded and asked why the other students were not being forced to write an apology note like Doe Child.

19. On April 13, 2017, Ms. Bresnick sent an email to Mother Doe, stating that she would have Doe Child write letters of apology to all students that she had teased over the past several days at recess, even though the alleged incident only occurred during recess on one day (not several days) and the teacher was not present. Mother Doe responded by clarifying that Doe Child was the one who had been teased and that Doe Child would not write a letter of apology unless all involved students were also required to write a letter.

20. On April 14, 2017, Ms. Bresnick sent an email to Mother Doe, stating that she would not have Doe Child write an apology letter to C, but she had spoken to Doe Child about her alleged behavior. Mother Doe responded by stating that she expects the students to be treated equally and that Doe Child did not feel safe at school anymore due to these incidents.

21. On April 14, 2017, Mother Doe sent an email to Ms. Holly, Ms. Dankner, Ms. Bresnick and Ann Rutherford (social adjustment counselor), stating that she was dissatisfied with how the school had responded to her concerns and that Doe Child was not being treated fairly by the teachers. Mother Doe also recited various previous incidents where Doe Child had been bullied by students and the bullying had not been properly addressed by the school. No action was taken by the teachers and staff, or any of the Defendants, to address Mother Doe's concerns in this email.

22. On May 16, 2017, Mother Doe sent an email to Ms. Holly, requesting that she address an incident that occurred during a field trip to a vernal pool the day prior. Doe Child had been recovering from a leg injury and student G jumped on Doe Child from behind, choking Doe Child by the neck. Instead of responding to Mother Doe's email directly, Ms. Holly instead humiliated Doe Child in front of her entire class the next day, on May 17, 2017, by yelling at the child to silence her as she disclosed the contents and author of her mother's May 16 email aloud to the entire class. Among the words uttered by Ms. Holly in this act of humiliation and public shaming were "Oh my God! Your mother sent me an email again! Now what do you think you are going to tell her after you come home> That you are God and the rest of people are bad?!" These were just some of the words and actions of Ms. Holly that day, in the course of her mocking, slandering and ridiculing of Mother Doe, and trying to make Doe Child feel guilty about the incident with G, all in front of Doe Child's entire class.

23. On May 17, 2017, Mother Doe sent an email to Ms. Holly, stating that Doe Child die not feel safe at school and was afraid to tell her teacher about incidents of bullying. Mother Doe explained how students G and C were calling Doe Child names and G physically assaulted Doe Child, but Doe Child had been wrongly penalized by Ms. Holly for these incidents. Mrs. Holly failed to respond to the email.

24. On May 17, 2017, Mother Doe sent an email to Ms. Bresnick, stating that she never received a response from Ms. Holly, that Ms. Holly humiliated Doe Child and made her feel guilty about the incident where she was choked by G, and that Doe Child did not feel safe going to school anymore. Ms. Bresnick

responded by stating that she would speak to Doe Child, but it was her opinion that Doe Child "seems to be happy." No action was taken by Ms. Bresnick to address Mother Doe's safety concerns or Ms. Holly's inappropriate behaviors and response.

25. On May 18, 2017, Doe Child stopped attending school for safety reasons. Mother Doe sent an email to Superintendent Gerardi, pleading for his assistance with issues that had gone unaddressed by Green Meadow School teachers and staff. Mother Doe followed up with a telephone call to Superintendent Gerardi the next day, on May 19, 2017.

26. On May 19, 2017, Mother Doe sent an email to Ms. Bresnick, stating that all communication should go through Mother Doe, not Doe Child, as it was inappropriate for Doe Child to be put in the middle of the dispute.

27. On May 19, 2017, Ms. Dankner sent an email to Mother Doe, requesting to schedule a time to meet to discuss Mother Doe's concerns.

28. On May 22, 2017, Superintendent Gerardi sent an email to Mother Doe, claiming that he missed the email sent to him by Mother Doe on May 18, 2017, and stating he would be available to meet with her in his office the next day.

29. On May 23, 2017, Mother Doe and Father Doe met with Superintendent Gerardi, with the Maynard Director of Student Services, with Ms. Dankner, and with Mr. Haller (who was then acting as an advocate for the Does), and all agreed upon an interim safety plan for Doe Child. Ms. Dankner sent an email to Mother Doe and Father Doe, confirming that she would have a version of the safety plan discussed at the meeting between the parents and Superintendent Gerardi ready for review the next day.

30. On May 24, 2017, Mother Doe sent an email to Ms. Dankner, stating that she had not received the safety plan as promised and that Doe Child would not be able to attend school without it. Mother Doe later received an unexpected voicemail from Ms. Bresnick requesting a meeting with Mother Doe and Doe Child as part of the bullying investigation. Mother Doe was not given prior notice that Ms. Bresnick would be involved in the investigation. Mr. Haller sent an email to Superintendent Gerardi requesting that a neutral party be appointed to lead the bullying investigation in lieu of Ms. Bresnick, as she was one of the aggressors. Mr. Haller suggested using Carol Gahan from the School District's central office to perform the investigation.

31. On May 25, 2017, Superintendent Gerardi sent an email to Mr. Haller advising that he intended to appoint Ms. Dankner to lead the bullying investigation. Superintendent Gerardi further stated: "[i]n regard to the safety plan and ▓▓▓▓[Doe Child's] education, it makes sense that we need to complete the investigation before providing an in-school safety plan. That is the process in our protocol." Mr. Haller responded by referencing the relevant provision in the Maynard Public Schools Bullying Prevention and Intervention Plan, and reminding Superintendent Gerardi that it was agreed at the May 23, 2017 meeting that a safety plan would be implemented immediately.

32. On May 30, 2017, Ms. Dankner sent an email to Mother Doe and Father Doe, providing a copy of a safety plan to support Doe Child's return to school while the bullying investigation was in progress. Ms. Dankner admitted that the plan was different than what was originally discussed at the meeting on May 23, 2017, and she requested more details on the bullying incidents and persons involved.

33. During the month of May and continuing through June and into the following summer of 2017, Doe Child received medical and mental health treatment, including individual therapy and counseling, through providers including but not limited to the child's primary care physician Margaret Werner, M.D. ("Dr. Werner") of Acton Medical Associates, and licensed psychologist Stephen L. Chapin, Ph.D. ("Dr. Chapin") of Littleton, Massachusetts, all as a direct result of the trauma she was experiencing at school and specifically as a result of the acts and omissions of the Defendants. These various medical treatments led to a number of physician's statements and notes to excuse Doe Child's absence from school, at various times in May and June of 2017. At the end of May and early

June of 2017, Dr. Chapin did a mental health evaluation of Doe Child, after which he diagnosed her, on June 8, 2017, with "adjustment disorder with mixed anxiety and depressed mood" and specifically noted: "███ is currently struggling with a high degree of anxiety that appears to be related to a series of experiences with school staff and peers that she has described to me, and which she is clearly very upset about. This anxiety is currently interfering with her ability to attend school." Together with this letter of diagnosis, Dr. Chapin also issued a "physician's statement for temporary home or hospital education" pursuant to 603 CMR 28.03(c), attesting that Doe Child "will require educational services at home for more than 14 days (through the end of the school year)."

34. On June 2, 2017, Mother Doe sent an email to Ms. Dankner, Mr. Haller, Carol Gahan, and Assistant Superintendent Jennifer Gaudet providing the names of the involved parties and aggressors, as requested by Ms. Dankner. Mother Doe explained that Doe Child would not be able to participate in an investigation, since she was seeing a mental health professional due to her severe traumatic experiences at school.

35. Based on the allegations in the Statement of Concern, Joel Krakow, PRS Specialist, sent correspondence to Superintendent Gerardi on June 7, 2017, requesting that Superintendent Gerardi review this matter and report on any identified concerns.

36. On June 12, 2017, Mother Doe sent an email to Lorraine Silverman, teacher at Green Meadow School ("Ms. Silverman"), stating that Ms. Dankner had referred her to Ms. Silverman to assist with home tutoring for Doe Child. Ms. Dankner issued the referral for only three (3) days of tutoring, even though Doe Child had missed an entire month of school due to the hostile environment and the failure of teachers and staff to protect Doe Child.

37. On June 22, 2017, in response to Joel Krakow's correspondence of June 7, 2017, Superintendent Gerardi submitted his Local Report to the Department of Elementary & Secondary Education ("DESE"). (*See attached* EXHIBIT B - Local Report of June 23, 2017). Assistant Superintendent Jennifer Gaudet later sent an undated, follow-up report to DESE. (*See attached* EXHIBIT C - Gaudet Followup Report).

38. On June 23, 2017, Attorney Tiffany E. Haines ("Attorney Haines") of the Shapiro Law Group, PC, 300 Trade Center, Suite 3700, Woburn, Massachusetts 01801, was retained to represent the Does.

39. On July 13, 2017, Attorney Haines submitted a formal demand on behalf of the Does, and the next day (July 14, 2017), she received a letter from Attorney Waugh, on behalf of the school district, enclosing the results of the School District's initial bullying investigation, in a letter dated July 12, 2017.

40. The letter from Attorney Waugh stated that "after investigating the matter, the principal concluded that no evidence of bullying actions were found." This letter was sent prior to receiving the Doe Family's response, through Attorney Haines, to the Local Report issued by Superintendent Gerardi, thus ignoring evidence, which was also never later considered, from the Does that should have been reviewed.

41. The School District claimed, in its investigation findings issued by Principal Dankner, that it had made "extensive examination of documentation" and "detailed interviews." And yet it failed to review the documentation submitted by the Does before closing out the investigation, prior to the 60-day period, under DESE's time standards for responding to complaints, that the Does had to supplement their claims with further documentation.

42. Although the School District then purported to reopen their investigation, at Attorney Haines' request, the School District continued to fail to examine the evidence provided by the Does and their attorney, during the summer of 2017. The School District's investigation thus ignored the most egregious incidents of bullying and retaliation and reported on the facts alleged in a selective and biased fashion leading to the self-serving conclusion that there had been "no bullying." (*See attached* EXHIBIT D - Letter of Attorney Haines to Paul Twomey of DESE, dated August 17, 2017).

43. On August 21, 2017, DESE sent a "Closure Letter" to Superintendent Gerardi, copying Attorney Haines (*See attached* EXHIBIT E - DESE Closure Letter of August 21, 2017). The Does then filed a complaint of

discrimination, against the DESE, on September 8, 2017, with the Massachusetts Commission Against Discrimination. (*See attached* EXHIBIT F - MCAD Complaint of September 8, 2017).

44. At the end of the summer of 2017, as the new school-year approached, the Does had to quickly seek refuge for their daughter, in order to continue her schooling which was no longer possible in Maynard, and so they moved to Acton, before they could possibly even begin to prepare their Maynard home to be sold. They believed Acton-Boxborough to be a safer school district for their traumatized daughter. The Does entered into a three-month lease for an apartment in Acton. They paid $1,688.00 per month, for three months, and incurred and paid an early termination fee for breaking their lease, which they did when they were able to purchase a condominium a few months later. The total cost of this duplicate housing expense was over $5,200.00, not including maintenance costs. Mother Doe and Father Doe continued to incur and pay the costs of their Maynard home while they remained unable to secure either the extra time or the extra money required to immediately renovate and prepare it for sale.

45. In September 2017, Doe Child began her third grade year at the Douglas School, in Acton, in the Acton-Boxborough Public School District.

46. In October 2017, Mother Doe and Father Doe filed a complaint to the Office of Civil Rights.

47. In November 2017, to be able to attend school in Acton, Mother Doe and Father Doe bought a two-bedroom condominium on ▓▓▓▓▓▓▓▓▓▓ where they have lived through the present day. They continued to pay the mortgage on their house in Maynard while incurring the additional (double) expense of their new home in Acton. They began incurring a new mortgage, condo fee, utilities, moving costs, and furniture expenses. They thus subsequently have incurred expenses of over $2,000.00 a month for their new home (mortgage, condo fee, utilities and other expenses), in addition to even greater expenses at their house in Maynard, where they continued to pay a monthly mortgage of $2,600.00.

48. From November of 2017 through June of 2019 (when they were able to sell their Maynard house), Mother Doe and Father Doe thus had duplicate home ownership expenses in the towns of Maynard and Acton, only necessary because of the acts and omissions of Defendants.

49. On November 28, 2017, Mother Doe received by email, a letter from the U.S. Department of Education, Office for Civil Rights (OCR), which denied relief on the complaint filed in October (*See attached* EXHIBIT F - OCR Letter Dated November 28, 2017).

50. Doe Child continued to struggle with mental health issues, and required psychological counseling, throughout her third grade year in the new school district in Acton, throughout the 2017-2018 school-year. Following various school-year efforts to treat Doe Child, the Does paid for her to attend private mental health treatment and counseling with various providers, including counseling over much of the past two years, with Daphne Papdopoulus, PsyD., at the clinic Be Well and Beyond, in Acton, Massachusetts.

51. In September of 2018, at the beginning of Doe Child's fourth grade year, the Does enrolled Doe Child for one semester in a private school, Sudbury Valley School in Framingham, in a trial effort to find a more suitable school environment where she would thrive and be able to overcome her mental health difficulties, most of which were caused by the trauma she had endured in Maynard at the hands of Defendants. The Does incurred and paid private tuition, at the rate of $10,000.00 per year, for the four months of her attendance there.

52. After that first semester of her fourth grade, Doe Child returned to the Acton-Boxborough School District to attend Blanchard Memorial Elementary School, in Boxborough.

53. On July 9, 2019, the Does sold their Maynard house, after which they were finally able to eliminate their duplicate housing expense. The house was sold for $417,000.00, which was about $20,000.00 below market value, in order to expedite the closing as the Does were desperate to reduce their monthly expenses (including about $2,800.00 per month for the Maynard house mortgage and maintenance costs). As part of the sale, they paid about

$20,000.00 as the 5 percent real estate broker's fee. They lost about $2,000.00 of income (SREC plus energy) from their solar panels and access to their L2 EV charger (which had given them savings on gasoline of up to $800.00 per year) and were forced to use non-electric cars. At their new home in Acton, they are unable to charge their electric car.

54. In the summer of 2019, Doe Child suffered a mental health emergency, including with suicidal conditions, that led to her hospitalization in the Taravista Behavioral Health Center, in Devens, Massachusetts, where she was diagnosed with Major Depression Disorder and Anxiety Disorder - this latter diagnosis being essentially the same as that which was initially given to Doe Child in the spring of 2017, when the Defendants effectively forced her out of school one month before the end of her second grade year.

55. The Does have continued to incur, in addition to those costs specifically mentioned above, numerous other costs for medical and psychological care, transportation to and from medical and psychological providers, private expenses, and both insured and uninsured expenses for treatment of Doe Child, from the spring of 2017 to date.

## STATEMENT OF CLAIMS

### COUNT I

**Federal Civil Rights Claim of Equal Protection Violation Through Discrimination Based on National Origin, And Deliberate Indifference to the Child's Federal Constitutional and Statutory Rights (§1983)**

#### (Against All Defendants)

56. Plaintiffs repeat the allegations contained in Paragraphs 1 through 55, above, and, by this reference, incorporate them herein.

57. Defendants were acting under color of law of the Commonwealth of Massachusetts when Plaintiffs were deprived of their right to equal protection under the United States Constitution, and subjected to discrimination based on national origin in violation of federal law, and to the deliberate indifference to the federal constitutional and statutory rights of Plaintiffs, including the failure to properly train staff and effectively address the hostile environment in school created by repeated incidents of harassment that the Defendants failed to address. *Canton v. Harris*, 482 U.S. 378 (1980); Seekamp v. Michaud, 109 F.3d 802, 808 (1st Cir. 1997), citing Lipsett v. Univ. of P.R., 864 F.2d 881, 902 (1st Cir. 1988) (a supervisor may be liable under §1983 "if (1) the behavior of his subordinates results in a constitutional violation, and (2) the supervisor's action or inaction was `affirmatively linked' to that behavior in that it could be characterized as `supervisory encouragement, condonation or acquiescence' or `gross negligence amounting to deliberate indifference.'" )

58. The conduct of Defendants thus deprived Plaintiffs of the "rights, privileges or immunities secured by the Constitutional and laws" of the United States, and as set forth in the federal civil rights statute, 42 U.S.C. §1983, and pursuant to Title VI of the Civil Rights Act, at 42 U.S.C. §2000d Et Seq.

59. As a result of such conduct, as summarized above, and as will be supplemented and more completely described upon completion of discovery, Plaintiffs have suffered damages and harm for which Defendants are liable.

### COUNT II

**State Law Claim of Equal Protection Violation Through Discrimination Based on National Origin and With Respect to the State Right to Equal Educational Opportunity Free of Discrimination and Harassment**

#### (Against All Defendants)

60. Plaintiffs repeat the allegations contained in Paragraphs 1 through 59, above, and, by this reference, incorporate them herein.

61. Defendants were acting under color of law of the Commonwealth of Massachusetts when Plaintiffs were deprived of their right to equal protection under the Massachusetts Constitution, and subject to discrimination based on national origin, in violation of the laws of the Commonwealth of Massachusetts, including the guarantee of equal education opportunity as provided in G.L.c.76 §5, as specifically elucidated and implemented through the Massachusetts Board of Education's regulations at 603 CMR §§26.01-09, which give school districts the affirmative duty to maintain an a school environment free of harassment or discrimination, including based on national origin, and to "respond promptly to such discrimination or harassment when they have knowledge of its occurrence." 603 CMR §26.07, and as specifically enforceable against a town such as Defendant Town of Maynard, under G.L. c. 76 §16. The Massachusetts Tort Claim Act does not insulate Defendants, including the Town of Maynard, from liability under G.L. c. 258, § 10(j), where, as here, the claim is not merely based on the failure to prevent or mitigate harm but rather on direct participation by an employee or employees in the cause of harm. Armstrong v. Lamy, 938 F. Supp. 1018, 1043-44 (D.Mass. 1996).

62. The conduct of Defendants thus deprived Plaintiffs of equal protection and equal opportunity to education that is free of discrimination and harassment, in violation of rights and privileges secured by the Constitution and laws of the Commonwealth of Massachusetts.

63. As a result of such conduct, as summarized above, and as will be supplemented and more completely described upon completion of discovery, Plaintiffs have suffered damages and harm for which Defendants are liable.

## COUNT III

### State Law Claim of Civil Rights Violation of the Right to Education
#### (Against All Defendants)

64. Plaintiffs repeat the allegations contained in Paragraphs 1 through 63, above, and, by this reference, incorporate them herein.

65. Defendants violated Plaintiffs' rights under the Massachusetts Constitution, and the Massachusetts Civil Rights Act, G.L. c. 12 §11, "by threats, intimidation or coercion, or attempt to interfere by threats, intimidation or coercion, with the exercise or enjoyment by any other person or persons of rights secured by the constitution or laws of the United States, or of rights secured by the constitution or laws of the commonwealth" (G.L. c. 12 §11H and 11I), by effectively forcing her out of the Town of Maynard, and denying her the right to education, and equal opportunity for such education, in the town where she resided, in further specific violation of G.L. c. 76 §5.

66. The conduct of Defendants thus deprived Plaintiffs of the rights and privileges secured by the Massachusetts Constitution, the Massachusetts Civil Rights Act and related laws of the Commonwealth of Massachusetts guaranteeing a right to public education, and equal opportunity for such an education, for Doe Child in the town where she resided.

67. As a result of such conduct, as summarized above, and as will be supplemented and more completely described upon completion of discovery, Plaintiffs have suffered damages and harm for which Defendants are liable.

## COUNT IV

### State Law Claim of Negligence in Training, Hiring, Supervision & Maintenance With Respect to Anti-Bullying Law
#### (Against All Defendants)

68. Plaintiffs repeat the allegations contained in Paragraphs 1 through 67, above, and, by this reference, incorporate them herein.

69. Defendants, through their acts and omissions, violated their duties, under the Anti-Bullying Law, G.L. c. 71 §370, through failing to provide proper training, hiring, supervision and maintenance of employees, in the enforcement and carrying out of that law, including where by doing so, they failed their duty to provide Doe Child with a safe environment (Alter v. City of Newton, 35 Mass.App.Ct. 141, 145), where the actions and omissions of

the Defendants in supervisory roles could be considered *affirmative acts* (Cormier v. City of Lynn, 479 Mass. 35, 40-41(2018), Barret v. Wachusetts Regional School District, No. 990246C), where the negligent hiring of teaching staff could itself be considered the *original cause* (Pettingill v. Curtis, 584 F.Supp.2d 348, 367 (D.Mass. 2008) of the harmful conditions of bullying by students and staff themselves, and where Defendants breached their duty to Plaintiffs to adequately investigate and remedy violations once reported to them, as required by the Anti-Bullying Law.

70. The conduct of Defendants thus constituted negligence, through the breach of duties of these duties of care owed to Plaintiffs under the provisions of the Anti-Bullying Law, as contained in G.L. c. 71 and related laws and regulations.

71. As a result of such conduct, as summarized above, and as will be supplemented and more completely described upon completion of discovery, Plaintiffs have suffered damages and harm for which Defendants are liable.

## COUNT V

### State Law Claim of Negligence in Failure to Prevent Harm With Respect to Anti-Bullying Law
### (Against All Defendants)

72. Plaintiffs repeat the allegations contained in Paragraphs 1 through 71, above, and, by this reference, incorporate them herein.

73. Defendants, through their acts and omissions, violated their duties, under the Anti-Bullying Law, G.L. c. 71 §370, through breach of their duty to prevent bullying harm to Doe Child, where municipal immunity for claims based on the failure to prevent the harm caused by a third party not originally caused by the public employer or any other person acting on the public employer's behalf, do *not* apply to "any claim based upon the intervention of a public employee which causes injury to the victim or places the victim in a worse position than he was in before the intervention." G.L. c. 258 §10(j)(2), or where an act of the public employee could be considered an *affirmative act* and an *original cause* of the harm, Cormier v. City of Lynn, 479 Mass. 35, 40-41 (2018) (municipality may be liable where there was an *affirmative act* rather than an omission on the part of the municipality and that act was a material, original cause of the harm, rather than an act that only exacerbated or contributed to it). Massachusetts Board of Education's regulations, at 603 CMR §§26.01-09, give school districts the affirmative duty to maintain a school environment free of harassment or discrimination, and to "respond promptly to such discrimination or harassment when they have knowledge of its occurrence." 603 CMR §26.07, and such a duty is specifically enforceable against a town such as Defendant Town of Maynard, under G.L. c. 76 §16. The Massachusetts Tort Claim Act does not insulate Defendants, including the Town of Maynard, from liability under G.L. c. 258, § 10(j), where, as here, the claim is not merely based on the failure to prevent or mitigate harm but rather on direct participation by an employee or employees in the cause of harm. See Cormier v. City of Lynn, *supra*, and Armstrong v. Lamy, 938 F. Supp. 1018, 1043-44 (D.Mass. 1996).

74. The conduct of Defendants thus constituted negligence, through the breach of duties of these duties of care owed to Plaintiffs, including under the affirmative duties as delineated in the Anti-Bullying Law, as contained in G.L. c. 71 and related laws and regulations.

75. As a result of such conduct, as summarized above, and as will be supplemented and more completely described upon completion of discovery, Plaintiffs have suffered damages and harm for which Defendants are liable.

## COUNT VI

### State Law Claims of Infliction of Emotional Distress
### (Against All Defendants)

76. Plaintiffs repeat the allegations contained in Paragraphs 1 through 75, above, and, by this reference, incorporate them herein.

9

77. Defendants, individually, and in their official capacities (as appropriate, relevant and permitted by law), and through acts and omissions, both intentional and negligent, have inflicted Plaintiff Doe Child with emotional distress, as defined by Massachusetts law.

78. As the result of the in-school bullying, the failure of Defendants to protect the child from the effects of that bullying, the violation of the Plaintiffs' rights as set out in the facts and in the other above claims, Doe Child has suffered emotional distress that has required therapy, led to suicidal ideation and threats as well as physical self-harm, and required ongoing psychiatric care and hospitalization, and negatively impacted her life and schooling in numerous other ways.

79. Defendants, through their acts and omissions, both intentional and negligent, have thus caused Plaintiff Doe Child to suffer emotional distress, leading to physical and psychological harm that has been manifested by objective symptomatology. A reasonable child of Doe Child's age would have suffered emotional distress under the circumstances of this case, just as she did, and thus the acts and omissions of Defendants constituted at the very least the negligent infliction of emotional distress. Defendant Ms. Holly in particular by her conduct either intended to cause, or should have known that her conduct would cause, emotional distress; that conduct was extreme and outrageous, and it did indeed cause emotional distress; therefore, her conduct constitutes the tort of intentional infliction of emotional distress on her part. Sena v. Commonwealth, 417 Mass. 250 (Mass. 1994). The Massachusetts Tort Claim Act does not insulate Defendants, including the Town of Maynard, from liability for negligent torts under G.L. c. 258, § 10(j), where, as here, the claim is not merely based on the failure to prevent or mitigate harm but rather on direct participation by an employee or employees in the cause of harm. See Cormier v. City of Lynn, and Armstrong v. Lamy, supra.

80. Public employees may be held liable for intentional torts, even if and when committed within the scope of their employment, Spring v. Geriatric Authority of Holyoke, 394 Mass. 274 (1985), in the circumstances as they exist here. Also the public employees among these Defendants are otherwise liable in their individual capacities, id. (with the municipality likely indemnifying such employees).

81. As a result of such conduct, as summarized above, and as will be supplemented and more completely described upon completion of discovery, Plaintiffs have suffered damages and harm for which Defendants are liable.

## COUNT VII

### State Law Claim of Defamation

### (Against All Defendants)

82. Plaintiffs repeat the allegations contained in Paragraphs 1 through 81, above, and, by this reference, incorporate them herein.

83. Defendants, individually, and in their official capacities (where relevant and permitted by law), are liable for the defamation of Plaintiffs Doe Child and Mother Doe.

84. Defendant teacher Ms. Holly, as set forth in the facts above, publicly shamed and humiliated Doe Child in her second grade class in front of her classmates, through Ms. Holly's affirmative, bullying act of reading out loud Mother Doe's email to the entire class, belittling the child's mother, Mother Doe, and deriding her in very strong and defamatory language, as it contained deliberately misleading and false statements vilifying Mother Doe, and thereby subjected Doe Child to ridicule by her classmates.

85. Defendant Ms. Holly's statements to Doe Child's class constituted slander of Mother Doe and Doe Child, as they constituted deliberately misleading or untrue, statements, about Mother Doe and they directly resulted in Doe Child being subject to ridicule, hatred and contempt by her peers and classmates. On their face, the slanderous statements appear to show malice; however, in these circumstances, even negligence should support an actionable claim for slander.

86. This particular slander, in the circumstances as described in the facts as stated above, and as shall be further indicated through the process of discovery in this case, need not be accompanied by proven actual, or special, damages, and is actionable without proof of economic loss. Nevertheless, the slander has caused demonstrable psychological harm, in the same manner and as stated above, in the preceding claim for emotional distress.

87. Defendants, therefore, through their acts and omissions, both intentional and negligent, have caused Plaintiff Doe Child to suffer emotional distress as a result of this defamation, leading to physical and psychological harm that has been manifested by objective symptomatology. A reasonable child of her age would have suffered actual harm under the circumstances of this case, just as she did. The Massachusetts Tort Claim Act does not insulate Defendants, including the Town of Maynard, from liability under G.L. c. 258, § 10(j), where, as here, the claim is not merely based on the failure to prevent or mitigate harm but rather on direct participation by an employee or employees in the cause of harm, in this case defamation of a child and her mother in front of the child's entire classroom. See Cormier v. City of Lynn, and Armstrong v. Lamy, *supra*.

88. Public employees may be held liable for intentional torts of defamation, even if and when committed within the scope of their employment, Spring v. Geriatric Authority of Holyoke, 394 Mass. 274 (1985), in the circumstances as they exist here. The public employees among these Defendants are also otherwise liable in their individual capacities, Id. (with the municipality likely indemnifying such employees).

89. As a result of such conduct, as summarized above, and as will be supplemented and more completely described upon completion of discovery, Plaintiffs have suffered damages and harm for which Defendants are liable.

### REQUEST FOR RELIEF

WHEREFORE, Plaintiffs request that this Court:

1. Enter a verdict for Plaintiffs on all counts against Defendants;

2. Award damages as determined at trial, plus interest, attorney fees and costs as provided by law;

3. Grant such other relief as the Court deems just.

### JURY DEMAND

Plaintiffs demand a jury trial on all issues so triable.

Respectfully submitted,
PLAINTIFFS,
By their Attorney,

DATE: October 4, 2019

_____
Steven R. Ballard, BBO #648092
Law Offices of Steven Ballard
354 Washington Street, Suite 323
Wellesley, MA 02481
781-591-2750
sballard@steven-ballard.com

# EXHIBIT A



**Massachusetts Department of
Elementary and Secondary Education**

75 Pleasant Street, Malden, Massachusetts 02148-4906 Telephone: (781) 338-3000 TTY: 1-800-439-2370

## PROBLEM RESOLUTION SYSTEM OFFICE
## INTAKE INFORMATION FORM

Please provide the following information.
Questions about this form, Contact (781) 338-3700 or compliance@doe.mass.edu

### Information about the School

Name of District/Collaborative/Private School: Maynard Public Schools

School Name/Location: _Green Meadow School_____   Address: _5 Tiger Dr, Maynard, MA 01754 __

Type of Student Program:   General Ed _X__    Special Ed (IEP) ___    504 Plan ___   Home School ___

### Information about You

Your Name (printed): ███████████   **Your Signature Required:** ███████████

Your Address: __5 Paul Rd_____   City/ Town _Maynard_____   State: __MA__   Zip Code: __01754 __

Contact phone: ███████   E-Mail: ███████

Your Role: _1_    1=Parent; 2=Advocate; 3=ESE Assigned Education Surrogate-Parent; 4=Student;
5=School Employee; 6=Other (Specify) _____

Primary Language:____English███████

Accommodations you require in communicating with the Department:  NONE

### Information about the Student or Group

Name: ███████   Grade:_2_   Age: _8__   Male/Female/Nonbinary: _F __

Address: ███████   Primary Language: __English███████

### Information about the Parent

Parent/Guardian (if not you): ███████   Contact Phone: ███████

Address: ███████   Primary Language: __English/Russian

## BRIEF STATEMENT OF CURRENT CONCERN(S)

**Please describe your concern, stating the specific facts on which the concern is based. Please attach any documents that you believe would be helpful to the Department in understanding your concern.**

Our daughter has been abused, intimidated, humiliated, bullied and publicly shamed for 2 years (1ˢᵗ and 2ⁿᵈ grades) at Green Meadow School by both students and teachers. As parents, we made multiple complaints to 1). Her 1ˢᵗ and 2ⁿᵈ grade teachers, 2) The vice principal of the school and 3).to the principal. The issues were never addressed, neither a single report or investigation was filed. See attached for a small sample of the emails sent.

Our daughter stopped attending the school for safety reasons a week and a half ago. We contacted the Superintendent of the Maynard Public Schools District who saw us on Tue May 23 2017. We immediately followed that meeting with a meeting with the Principal (and our advocate). We agreed on a safety plan and steps forward to enable ███████'s immediate return. We were to receive the plan by May 24, the lastest. It has never been sent. The district's bullying policy states that a safety plan should happen immediately upon the start of an investigation, the Superintendent claims it is after the investigation. The promised was never kept, the safety plan never developed and our daughter is experiencing severe stress trauma and is seeing a counselor. Our daughter has no sense of safety in the school, and the school is not offering any.

## YOUR ATTEMPTS TO RESOLVE CURRENT CONCERN(S)

We flagged the bullying, intimidation, abuse and public shaming issues for two years in emails, phone calls made to schools and visiting the teachers. Eventually we contacted the Superintendent, who took upon the issue resolution and stopped responding since Thur May 25 2017. The school has not made any calls about our daughter's absence since the same day.

## ACTIONS BY THE SCHOOL YOU BELIEVE WOULD RESOLVE YOUR CONCERN(S)

Responding to emails made by our advocate, developing a safety plan that guarentees both a sense of safety, and actual safety for our daughter. A full and fair bullying investigation in to the actions of both students and teachers who were aggressors in many of the situations.

**Are any of these concerns currently being addressed by Mediation or a Hearing in the Bureau of Special Education Appeals (BSEA)?   [X] NO   [ ] YES**

_You must send a copy of this complaint to the school district_

**X** I sent a copy of this complaint to: (Name/Title):_Superintendent Gerardi _Date:_ May 29, 2017_

Address: Maynard PS, 3-R Tiger Dr. Maynard MA 01754 ___     Telephone/Email (978) 897-2222 /

RGerardi@maynard.k12.ma.us_____

<u>For charter school complaints only</u>: If you have forwarded your concerns to the Board of Trustees, please include your complaint and the Board's response.

**Sign and return this Intake Information Form to: PRS Intake Coordinator**
**75 Pleasant Street, Malden, MA 02148-4906 or by Fax at 781-338-3710**
To send by email: **Compliance@doe.mass.edu** save the completed form and attach it to
your email, with a subject line that reads: LAST NAME PRS Intake Form.

---

**Confidentiality and Third Party Information Sharing**

---

*This page is for persons who file a complaint but are not the student's parent, guardian nor an adult student (18 years of age or above).  These types of complaints are known as "third party" complaints.*

*Third party complaints are typically filed by advocates, attorneys or an agency representative. Due to the requirements of federal and state privacy laws, it is necessary for the Department to obtain explicit consent in order to share any student information with a third party.*

*If your complaint does not involve a third party, then you do not need to fill out this page or return it to the Department.*

**Provision of consent for Department sharing of student information with a third party:**

I, (print name) ⬛⬛⬛⬛⬛⬛⬛⬛

give my consent to the Department of Elementary and Secondary Education to

share information regarding (student)_ Sofiia Liashchenko _____ with:

(Name) _Craig A. Haller / Haller Advocacy___ regarding this complaint.

Signature of ~~Parent/Guardian~~/Adult Student:

⬛⬛⬛⬛⬛⬛⬛⬛_____Date:_ May 28, 2017_____



HALLER ADVOCACY
www.SPEDADVOCATE.COM

# SPECIAL EDUCATION ADVOCATE
### WORKING TOGETHER FOR THE SUCCESS OF YOUR CHILD

PRS Specialist:

Attached are multiple emails and email trails that show the continuing harassment and bullying that has occurred. There has never been an investigation that the family is aware of.

The first email trail is between me, the family's advocate (third party release is signed as part of this intake form) and the Superintendent. It is important to note that the Superintendent will only put a Safety Plan in effect after the investigation, "It makes sense that we need to complete the investigation before providing an in-school safety plan." This is in direct contrast to the Maynard Public Schools Bullying Prevention and Intervention Plan and is what is currently keeping ███ out of school.

A plan to have ███ was agreed upon, she would have all her "extras" with a different class and her core education would happen in a sub-separate room with other students. This agreement seems to have disappeared.

Thank you for your time and considerations.

Craig A. Haller

5/29/2017

Haller Advocacy Mail - SL: follow-up to our meeting



Craig Haller <craig@spedadvocate.com>

## SL: follow-up to our meeting

**Craig Haller** <craig@spedadvocate.com>
To: Robert Gerardi <rgerardi@maynard.k12.ma.us>
Cc: ▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓

Thu, May 25, 2017 at 2:18 PM

<jgaudet@maynard.k12.ma.us>, Carol Gahan <cgahan@maynard.k12.ma.us>, Donna Dankner ▓▓▓ Jennifer Gaudet <ddankner@maynard.k12.ma.us>

Dr. Gerardi:

I agree that Principal Dankner would be an appropriate choice and it is my understanding that that is ok with the family.

As for the safety plan, page 8 of the *Maynard Public Schools Bullying Prevention and Intervention Plan November, 2015* clearly states:

> Before fully investigating the allegations of bullying or retaliation, the principal or designee will take steps to assess the need to restore a sense of safety to the alleged target and/or to protect the alleged target from possible further incidents. Responses to promote safety may include, but not be limited to, creating a personal safety plan; ...

And this is precisely what we agreed to during our meeting with the Principal. Has the process in your protocol changed since that plan was developed and is the Principal unaware of the new process?

-Craig

On Thu, May 25, 2017 at 1:58 PM, Robert Gerardi <rgerardi@maynard.k12.ma.us> wrote:
Dear Mr. Haller,

In regard the bullying investigation, it is always best to have the administrator closest to the students do the investigation. If you are concerned about Mrs. Bresnick's impartiality, I will have Principal Dankner do the bullying investigation. The students in the class know Mrs. Dankner and she would be better able to get the information needed to complete an investigation rather than a central office employee like Carol Gahan.

In regard to the safety plan and ▓▓▓'s education, it makes sense that we need to complete the investigation before providing an in-school safety plan. That is the process in our protocol. In the meantime, we would like ▓▓▓ to return to school and we will place an additional staff member in the classroom to monitor the situation so ▓▓▓ will feel safe.

Sincerely,
Bob Gerardi

Robert J. Gerardi, Jr, Ph.D.
Superintendent of Schools
3 R Tiger Drive
Maynard, MA 01754
Phone: **(978) 897-2222**
Fax:  **(978) 897-4610**

"If children are unable to learn, we should assume that we have not yet found the right way to teach them" (Marie Clay)



On Wed, May 24, 2017 at 7:11 PM, Craig Haller <craig@spedadvocate.com> wrote:

5/29/2017                        Haller Advocacy Mail - 📧 follow-up to our meeting

That said, there is one issue I need to escalate to you. The family received an unexpected voicemail from Deborah Bresnick requesting a meeting with ████ and her mom. It appears that Ms. Bresnick is conducting a bullying investigation. The problem is that the family feels Ms. Bresnick and two teachers are actually part of the problem, either directly as aggressors or enabling such. Neither ████ nor her mom are comfortable with discussing any of this with her.

May I suggest a more neutral party, such as Ms. Riccardi-Gahan? I can make this request directly to the Principal, but that brings me to my second question for you.

On one of two voicemails to the family today a lawyer was mentioned. I would appreciate knowing if, in fact, you have brought counsel into this situation.

Thank you again for your time and considerations.

-Craig

--
Craig Haller, Special Education Advocate
Haller Advocacy
617.435.1759
Fax: 617.383.5245
SPEDadvocate.com

--
Craig Haller, Special Education Advocate
Haller Advocacy
617.435.1759
Fax: 617.383.5245
SPEDadvocate.com

5/29/2017                                    Haller Advocacy Mail - Fwd: Notes and letters



Craig Haller <craig@spedadvocate.com>

## Fwd: Notes and letters

To: Craig Haller <craig@spedadvocate.com>                   Sun, May 28, 2017 at 1:40 PM

———— Forwarded message ————
From:
Date: Tue, May 31, 2016 at 4:45 PM
Subject: Notes and letters
To: Candace Adamson <cadamson@maynard.k12.ma.us>

Hello Mrs Adamson,

I hope this find you well on this hot last May day. ████ came home very upset (which is not the first time) saying things about notes, letters and parents having to sign something which could have certainly have been discussed with a parent first.

████ has learned a great deal from the first grade, she is a good reader, likes math, science, art, music and her classmates as well.

Yet, her self-esteem has been pretty low ever since she was sent away whenever she felt she needed advice and warm assistance from you, being threatened about notes sent home that she was forced to write about accidental things -kids are kids, they move a lot, they are inquisitive and full of energy,  I am sure, Mrs Adamson, we can help my little girl leave a positive experience from the first grade without rude voicing this over and threats, phone calls which bring no effect rather she refuses to go to school feeling unsafe.

How can we work together to boost her self-esteem and positive impressions from the first grade? I am looking forward to your thoughts and if you need any help, please, let me know.

I wish you a good night.

Thank you.



5/29/2017



Haller Advocacy Mail - Fwd: Last days experience

Craig Haller <craig@spedadvocate.com>

## Fwd: Last days experience

To: Craig Haller <craig@spedadvocate.com>

Sun, May 28, 2017 at 1:36 PM

———— Forwarded message ————
From: ▓▓▓▓▓▓▓▓▓▓▓▓▓
Date: Fri, Jun 17, 2016 at 8:52 AM
Subject: Re: Last days experience
To: Deborah Bresnick <dbresnick@maynard.k12.ma.us>
Cc: Donna Dankner <ddankner@maynard.k12.ma.us>

Mrs Bresnik: attached, pls find the unanswered email I was referring to and the time shown. She and I feel unsafe to send her to Mrs Adamson's class under the given attitude. See the reasons in my previous email, which I clearly outlined. Thank you.

On Fri, Jun 17, 2016 at 8:38 AM, Deborah Bresnick <dbresnick@maynard.k12.ma.us> wrote:
> Good morning, ▓▓▓▓▓▓▓
> I just spoke with Mrs. Adamson and she let me know that she did respond to you last night at around 9:30pm. Please let me know if you haven't received that email and I will make sure that it is sent to you. We look forward to seeing ▓▓▓▓ here at school.
> Thanks, Debbie

> On Fri, Jun 17, 2016 at 7:56 AM, ▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓ wrote:
> Dear Mrs. Dankner and Mrs Bresnik!
>
> This is to let you know that with my loyalty and respect to you, I feel, my daughter ▓▓▓ feels very apprehensive and unsafe to attend Mrs Adamson's class, where she has been suffering from biased attitude, I believe discrimination, being called ' silly', was intimidated and stressed out, thus that consequently, affected her performance.
>
> Sincerely,
>
> ▓▓▓▓▓▓▓▓▓▓▓▓▓▓
>
> P.S. I am forwarding this correspondence, since I have not heard from the teacher on my last letter and feel unsafe to send my daughter to school today. Thank you very much.

———— Forwarded message ————
From: ▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓
Date: Thu, Jun 16, 2016 at 10:11 PM
Subject: Re: Last days experience
To: Candace Adamson <cadamson@maynard.k12.ma.us>

Thank you for your prompt feedback. I wasn't just hoping -we were working hard to make this happen. Luckily, we maintain close relationships based on trust and my daughter always tells me the circumstances, under which this or that incident happens. Last time I clearly let you know that I do want both parts to work hard, and that as a parent I am one of those parts. You definitely know that we are foreigners here and it takes time to learn the local culture even the school system which varies from town to town. sometimes ▓▓▓▓ can be hard to understand and likewise. I did not say that I wanted to come to school to discuss things- I asked you if you saw the need for that. What I wanted to let you know that I'm actively participating in my daughters life and I want her to feel safe and be taken adequately. Remember, English is not her native language and that should be taken into ▓▓▓▓▓▓▓▓▓

5/29/2017

Haller Advocacy Mail - Fwd: Last days experience

I hope tomorrow will be a better day. Today when I was in school seemed to be one of those days. I am sorry I was mistaken.

On Jun 16, 2016 9:52 PM, "Candace Adamson" <cadamson@maynard.k12.ma.us> wrote:

Hi ████████,

████████ has had a good week. Today was difficult for her and I did indeed tell her that I would call you if she did not change her behavior. She has not been very kind to the other children, myself or Mrs. Cochoran. She has been very silly and always has an excuse for her behavior. I do not know about the incident regarding a girl's shirt. If you would like to come in please let me know what time works for you. I have forwarded your email to Mrs. Bresnick and Mrs. Small. I have bus duty on Friday morning at 8:15 - 8:30. I was also hoping the last few days would pass by in peace. Let's try to make that happen.

Candace

On Thu, Jun 16, 2016 at 9:47 PM, Candace Adamson <cadamson@maynard.k12.ma.us> wrote:

Hi ████████,

████████ has had a good week. Today was difficult for her and I did indeed tell her that I would call you if she did not change her behavior. She has not been very kind to the other children, myself or Mrs. Cochoran. She has been very silly and always has an excuse for her behavior. I do not know about the incident regarding a girl's shirt. If you would like to come in please let me know what time works for you. I have forwarded your email to Mrs. Bresnick and Mrs. Small. I have bus duty on Friday morning at 8:15 - 8:30. I was also hoping the last few days would pass by in peace. Let's try to make that happen.

Candace

On Thu, Jun 16, 2016 at 8:34 PM, ██████████████████████████████ wrote:
Good evening mrs Adamson.

This is to let you know that for the last several days including last week ████████ has been feeling very anxious and unsafe to be in the classroom because of mrs. Corcoran (pardon me if I misspelt her last name) and you scolding her and threatening to call me not to send go to school because she liked a girl's shirt?- she and I know the girl (she just confessed to me). If you feel we need to talk, you are welcome and I can come to school to discuss that with mrs Bresnik and you, but I did hope that the last few days before end of the year would pass by in peace...

████████

--
Debbie Bresnick
Assistant Principal
Green Meadow School
Maynard, MA  01754

978-897-8246  x 334

2 attachments


time_response_adamson.png
129K

5/23/2017

Haller Advocacy Mail - Fwd: Last days experience

time_response_adamson-1.png
33K

5/29/2017

Haller Advocacy Mail - Fwd: ████████

# Gmail
by Google

Craig Haller <craig@spedadvocate.com>

## Fwd: B█████████

████████████████████████████████

To: Craig Haller <craig@spedadvocate.com>

Sun, May 28, 2017 at 1:39 PM

———— Forwarded message ————
From: **Deb Holly** <holly@maynard.k12.ma.us>
Date: Wed, Jan 25, 2017 at 9:51 AM
Subject: Re: B████████████████
To: ████████████████████████████

████████-

Thanks for letting me know-
I am certain that Janice will take care of the bus incident

DEB

On Tue, Jan 24, 2017 at 4:48 PM, ██████████████████████████████ wrote:
Thank you Mrs  Holly. Oh, those girls..... however████reassured me that all she did was smiling and there space was broken by the other one. Anyway physical violence should not be used  in any case.  Neither should verbal -

TODAY:

████ came out of the bus almost crying saying that a third grader girl who was sitting right behind her was calling her ugly stupid and sticking her tongue in front of her because ████ was singing a song to K███. Now ███is calling herself ugly, thinks that she is ugly and I don't know what I should be doing with that...  I saw her talking to Janice on her way out of the bus and Janice inquired who the girl was.  ████ does not know her name......

On Jan 24, 2017 3:35 PM, "Deb Holly" <holly@maynard.k12.ma.us> wrote:
I spoke with████ and B████ this afternoon
My understanding of the slap is this:

████was in line "smiling" in B████'s face. (████ kept her face **really close** to B████'s face...not maintaining socially appropriate personal space)

B████ misunderstood ████'s intent- and thought ████was making "puppy" faces at her.

B████ asked her to stop
████ says she did not understand that B████ had asked her to stop because she was "Yelling at her".
B████ explained that she was yelling at ████ because she was really annoyed

Out of frustration with ████'s invasion of her personal space and being overly silly, B████ slapped her!!!

I talked to both girls about being clear and specific with each other - to communicate calmly in a kind and safe manner with each other at all times.

I explained that slapping is a totally unacceptable way to handle frustration and annoyances.

B████ apologized to ████for yelling and slapping and promised not to do it ever again.

████ apologized for getting in B████'s face and for annoying her- she didn't mean to!

The 2 girls explained that they have had problems in the past and that they ██████████████████████████

5/29/2017                                   Haller Advocacy Mail - Fwd: B▓▓▓▓▓▓-

They agreed that the smarter course of action would have been to get the help of a bus teacher or to "go tell an adult"!

It is my belief that this issue has been put to rest
DEB

On Mon, Jan 23, 2017 at 4:12 PM, ▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓ wrote:
She says she did not have a chance to. Thank you!

On Jan 23, 2017 4:07 PM, "Deborah Bresnick" <dbresnick@maynard.k12.ma.us> wrote:
Hello ▓▓▓▓▓▓
I saw ▓▓▓▓▓ walking towards her bus this afternoon and she didn't say anything to me. I'll check in with her tomorrow. Thanks for letting me know.
Debbie

On Mon, Jan 23, 2017 at 3:59 PM, ▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓ wrote:
Hi mrs Bresnik ▓▓▓▓▓ told me that B▓▓▓▓▓▓ slapped her in the face in the busline at the end of the day - that incident ruined such a beautiful day she had...

Thanks for your understanding. ▓▓▓▓▓▓▓▓▓▓▓▓

Debbie Bresnick
Assistant Principal
Green Meadow School
Maynard, MA 01754

978-897-8246 x 334

**Deb Holly**
Second Grade
Green Meadow School
holly@maynard.k12.ma.us
(978) 897 8246

**Deb Holly**
Second Grade
Green Meadow School
holly@maynard.k12.ma.us
(978) 897 8246

5/29/2017                                    Haller Advocacy Mail – Fwd: ▮▮▮s Day

# GMail
by Google

Craig Haller <craig@spedadvocate.com>

## Fwd: ▮▮▮▮'s Day

To: Craig Haller <craig@spedadvocate.com>                    Sun, May 28, 2017 at 1:41 PM

——— Forwarded message ———
From: ▮▮▮▮▮
Date: Thu, Apr 13, 2017 at 4:50 PM
Subject: Re: ▮▮▮s Day
To: Deb Holly <holly@maynard.k12.ma.us>

why dont they write a note? I am not signing the slip. We need to be fair, please refer to my last letter.

On Apr 13, 2017 4:48 PM, ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ wrote:
A▮▮▮▮ and C▮▮▮ keep chorusing meanie meanie all the time. You did not even let her talk! When can we have a talk?

On Apr 13, 2017 4:42 PM, "Deb Holly" <holly@maynard.k12.ma.us> wrote:
I had an after school meeting and just received your phone message-

The phone number you left does not accept incoming calls- I was disconnected when I tried to return your call

It seems to me that the explanation that ▮▮▮▮ gave to you is NOT the same version of the incident that I have discussed with the students!  Every time that I ask ▮▮▮▮ to tell me what happened I get a different story pointing the blame on others and away from her part in the situation.

Because there have been problems with all 4 children this week- ALL 4 of the students have been asked to "take a break" and find other people to play with.

They ALL need to practice being kind and safe FRIENDS at recess.  Teasing and laughing turns into bullying when any child keeps teasing and laughing at the same person at each recess.  ▮▮▮▮ is not completely innocent, NOR are the other students involved.

Please try to understand that, from my observations, ▮▮▮▮ is not as innocent as she proclaims.  I love her dearly, but she needs to learn to stop and think and make kind choices.   When she does not treat others kindly, then she needs to apologize.

▮▮▮▮ is not being "punished" for something that she did not do... She owes an apology to the boy because she WAS teasing.

G▮▮▮▮ "stole the ball" BUT ▮▮▮▮ was taunting the boy by laughing at him and running away with G▮▮▮▮  It hurt the boy's feelings and he told her she was being mean.  He did not call her a "meanie" ... He asked her to stop teasing and she did not stop, so he told her that he did not like it  and stop being mean.

EVERYONE involved is receiving a "logical consequence" for their own behavior.

Tomorrow is another day, and another chance to turn this problem around.  Then we will all have a week of vacation to look forward to!

Thank you for your understanding and support-
DEB

5/29/2017

Haller Advocacy Mall - Fwd: ⬛⬛s Day

I carefully listened to ⬛⬛s complete story Mrs Holly - this does not sound right - why should SHE write letters or suffer from unfair accusations if SHE was bullied and name-called (meanie meanie!) by the students in question? She is in tears saying you did not even give her a chance to talk - while A.and C got away from blame if that's them. She needs a healthy environment to learn two-way street and not swallow the accusation for the sake of being part of celebration of the end of the year. She was ready to accept the blame though she did NOT bully the boy. SHE SHOULD NOT ACCEPT something she did not do! Never! I am against her writing and me signing for others. HE ripped the ball out of her hands (haha I do not really get why she uttering - she claims to show him the wrong way he was doing that... That we'll talk about) But other than that, I need to talk to you - I called you today still haven't heard from you.

You need to ask⬛⬛ which swearing words her buddy students (I assume one of the 'students in question' which you refer to as bullied by her? teach her on the bus and what they do to other students (scratching to blood) and this is ⬛⬛bullying?

Keeping⬛⬛ and G⬛⬛apart seems a fair idea to me.How about talking to the boys stopping to name-call ⬛⬛? C⬛⬛ has been calling her meanie for the past few months - I keep hearing that, and that's NOT bullying?

Advise, please.

Thanks.

On Thu, Apr 13, 2017 at 1:53 PM, ⬛⬛⬛⬛⬛ wrote:
is G⬛⬛ receiving the same form? Is she involved too? OMG

On Apr 13, 2017 1:52 PM ⬛⬛⬛⬛⬛ wrote:
Ohhhhh.....

What is this form about? Who is the boy? I can't believe it!......

On Apr 13, 2017 1:48 PM, "Deb Holly" <holly@maynard.k12.ma.us> wrote:

I am so sorry to have to write this email-
⬛⬛ is having a rough day.

She spent recess teasing and laughing and saying "Ha HA!" to a boy that was playing with a ball. She was having fun with G⬛⬛, but, they were not being kind. They were teasing and when they were asked to stop...unfortunately they did not. They have been "picking on" the same child all week, like "partners in crime".

I know that you have talked to ⬛⬛ about choosing friends and trying to stay away from "problems"...G⬛⬛ and ⬛⬛ should take a break from eachother for a while...they do not have a positive affect on eachother.

Tomorrow, during her morning recess, ⬛⬛ will be writing a letter of apology for her taunting and teasing.

Today I am sending home a behavior form for you to sign...I am concerned that ⬛⬛ is "becoming a bully" because she continues to tease and taunt the same boy, and continues to make inappropriate choices at the expense of other children in order to make her friend laugh!

That is neither kind nor safe
Again- Sorry to be the bearer of sad news!
DEB

**Deb Holly**
Second Grade
Green Meadow School
holly@maynard.k12.ma.us

5/29/2017



Haller Advocacy Mail - Fwd: Bullying Issues

Craig Haller <craig@spedadvocate.com>

## Fwd: Bullying issues

To: Craig Haller <craig@spedadvocate.com>

Sun, May 28, 2017 at 1:37 PM

——— Forwarded message ———
From:
Date: Fri, Apr 14, 2017 at 10:18 AM
Subject: Bullying issues
To: Deb Holly <holly@maynard.k12.ma.us>, Deborah Bresnick <dbresnick@maynard.k12.ma.us>, Donna Dankner <ddankner@maynard.k12.ma.us>, Ann Rutherford <arutherford@maynard.k12.ma.us>,

Dear Mrs Bresnik: this is a follow up on our conversation yesterday In which I expressed my dissatisfaction on how bullying issues towards ▓▓▓▓ have been handled up to now.

More bullying issues flagged by me to you yesterday which I had not reported before since the incident with physical violence from B▓▓▓▓▓▓ upon ▓▓▓ was not properly addressed are listed below:

1. In the winter a boy on the bus was rummaging through ▓▓▓'s backpack with no permission (▓▓▓ knows his name)

2. Another boy In line ( bus #4) kept hitting her multiple times while waiting for the bus (▓▓ can show the boy and knows his name)

3. Starting winter 2017, a boy from her classroom named C▓▓ kept calling ▓▓▓ meanie and when ▓▓▓ would contact her teacher about it, she would not listen to her whereas, like yesterday, when C▓▓ was allegedly reporting ▓▓▓'s' calling him the same name, the teacher would take the boy's side and never let my daughter have a chance to speak (multiple times) Instead having me sign a form in which ▓▓▓ is accused of bullying.

Going back to B▓▓▓ ▓▓▓ reported to me that Mrs.Holly 'spoke' to B▓▓▓ about hitting ▓▓▓ in the face. My question: where is the apology note written by B▓▓▓ and did her parents sign at least one behavior form for bullying ▓▓▓? (which did not happen once)

This serves as an evidence of my reporting about those issues belatedly since my child's needs in the classroom are ignored and independently could not be resolved (she did not feel safe and scared to)

5/29/2017

Haller Advocacy Mail - Fwd: ███'s recess behavior

# GMail
by Google

Craig Haller <craig@spedadvocate.com>

## Fwd: ████'s recess behavior

To: Craig Haller <craig@spedadvocate.com>

Sun, May 28, 2017 at 1:38 PM

——— Forwarded message ———
From: ████████
Date: Fri, Apr 14, 2017 at 10:28 AM
Subject: Re: ████'s recess behavior
To: Deborah Bresnick <dbresnick@maynard.k12.ma.us>
Cc: Deb Holly <holly@maynard.k12.ma.us>, Ann Rutherford <arutherford@maynard.k12.ma.us>

Will C████ write at least one for calling █████ names and distorting her name almost every single time he does? I expect the boys AND-█████ to be treated on equal terms since SHE PLAYS with them like with everyone else. She is fond of her friends but does not feel safe anymore.

On Fri, Apr 14, 2017 at 10:13 AM, Deborah Bresnick <dbresnick@maynard.k12.ma.us> wrote:
> Hello █████████,
>
> Thank you, I will not have █████ write the letter to C████. However, she has been seen and spoken to at recess for behaviors that resemble teasing, such as pretending to play with someone and then running away. I will be having a conversation with her about showing us how kind she can be.
> Thank you, Debbie

On Thu, Apr 13, 2017 at 5:42 PM, ████████████████████ wrote:
>> Mrs. Bresnick, ████ did not tease. She was teased. That is not correct. I am against her writing something for others doing that to her. If she is made to, call me I will come to school. She will write any notes on condition the students do the same.

On Apr 13, 2017 2:29 PM, "Deborah Bresnick" <dbresnick@maynard.k12.ma.us> wrote:
>>> Hello,
>>>
>>> I wanted you to know that because of █████'s behavior at recess for the past several days, I will be meeting with her during tomorrow morning's recess so that she will be able to write apology letters to students who she has teased.
>>> Thanks,
>>> Debbie

--
Debbie Bresnick
Assistant Principal
Green Meadow School
Maynard, MA  01754

978-897-8246  x 334

--
Debbie Bresnick
Assistant Principal
Green Meadow School
Maynard, MA  01754

978-897-8246  x 334

5/29/2017

Haller Advocacy Mail - Fwd: VERNAL POOL MONDAY!

# Gmail

Craig Haller <craig@spedadvocate.com>

## Fwd: VERNAL POOL MONDAY!

· 1 message

To: Craig Haller <craig@spedadvocate.com>

Sun, May 28, 2017 at 1:37 PM

———— Forwarded message ————
From: **Donna Dankner** <ddankner@maynard.k12.ma.us>
Date: Fri, May 19, 2017 at 3:30 PM
Subject: Re: VERNAL POOL MONDAY!
To:

Hi Mrs.

I am sorry to hear of your concerns. I left you a message earlier today. I would like to meet with you to discuss the issues and work toward resolution. Please let me know when you would be avaiable.
Sincerely,
Donna Dankner

On Fri, May 19, 2017 at 3:09 PM, wrote:
No thank you. I want all communication to go through me and my husband not through my daughter. There is no reason to put my daughter in the middle of this. We are taking further steps to solve the issue.

On May 17, 2017 10:28 PM, "Deborah Bresnick" <dbresnick@maynard.k12.ma.us> wrote:
Hello
I will speak with tomorrow and try to find out what's been going on. I've seen her a couple of times in various spots and she seems to be happy.
Thanks, Debbie

On Wed, May 17, 2017 at 4:21 PM wrote:
Mrs Bresnik, I believe I need to talk to you - I do not understand what is going on - I sent this email to Mrs Holly early in the morning and no answer about the incident - was being choked by G at the vernal pool - and after that I sent it, Mrs Holly instead of responding to ME was screaming at making her feel guilty because was DEFENDING HERSELF from being choked! does not feel safe in her classroom, around G and does not wish to go to school.

———— Forwarded message ————
From:
Date: Wed, May 17, 2017 at 6:49 AM
Subject: Re: VERNAL POOL MONDAY!
To: Deb Holly <holly@maynard.k12.ma.us>

Hi Mrs Holly: I am concerned that there has been multiple complains of being, at times, physically dragged into trouble by G , like during the vernal pool trip and being penalized. G 's side has been mostly taken and was the victim. She does not feel safe. She also let me know yesterday that O was calling her p****p and my daughter was afraid to even let you know. I do not feel right about it.

Can you please see to it?

Thank you.

Just a friendly reminder:m
Our class will be doing our fieldwork at the Vernal Pool on Monday MORNING, May 15th!

Children should wear weather appropriate clothing because we will go out rain or shine
We need boots and bug repellant wipes (Or spray clothing at home?)

Thank you for helping your child be ready to work as an environmental scientist studying NATURE!

Happy Mother's Day, too!
DEB
--
**Deb Holly**
Second Grade
Green Meadow School
holly@maynard.k12.ma.us
(978) 897 8246


--
Debbie Bresnick
Assistant Principal
Green Meadow School
Maynard, MA  01754

978-897-8246  x 334



--
Donna Dankner
Principal
Green Meadow School
5 Tiger Drive
Maynard, Mass.
978-897-8246

ddankner@maynard.k12.ma.us

# EXHIBIT B

## THE DEPARTMENT OF ELEMENTARY AND SECONDARY EDUCATION
### Problem Resolution System

### LOCAL REPORT FORM
Due date for Local Report:  June 23, 2017
In Response to Intake Number: 17-0928

LEA:  Maynard Public Schools

Student Name: Sofia Lyashchenko

Submitted by: _ROBERT J. GERARDI_    Date: _6/22/2017_

Reported by: _ROBERT J. GERARDI_  Title: _SUPERINTENDENT_

> This report must include a statement of activities completed in the district's review of this matter, and if necessary, any corrective action taken and compensatory services offered, together with completion date(s) and copies of any documents cited in this report.
>
> **A copy of this Local Report must be sent to the person registering this complaint but do not share with the complainant any student-specific personally identifiable information regarding other students.**

_PLEASE  SEE  ATTACHED  LETTER_

The District Report was sent to the complainant on *(date)* _6/22/2017 VIA EMAIL_

*The Maynard Public Schools are committed to high academic standards that encourage students, teachers, and community members to achieve their personal best through lifelong learning.*



### MAYNARD PUBLIC SCHOOLS
3 R Tiger Drive, Maynard, Massachusetts 01754
*Robert J. Gerardi, Jr., PhD*
Superintendent of Schools
*rgerardi@maynard.k12.ma.us*
978-897-2222

June 22, 2017

Joel Krakow, DESE PRS Specialist
Problem Resolution System Office
75 Pleasant Street
Malden, MA 02148

RE: Intake 17-0928

Dear Mr. Krakow,

This is the attachment to the LOCAL REPORT FORM that you sent for me to fill out in my role as the Superintendent of Schools. This report will include:
1. A statement on the concern you listed on page 1.
2. A statement of activities completed in the review
3. Responses to the information you requested on Page 2.
4. Any corrective action taken by the district with completion dates
5. Copies of supporting documents.

### A statement on the concern you listed on page 1.

The ▮▮▮▮▮▮▮▮▮ demanded a meeting in my office on May 23, 2017. They came to my office with a special education advocate. I requested the inclusion of the Maynard Director of Student Services in the meeting in case there was a need for information on Special Education services. The ▮▮▮▮▮▮▮▮▮ alleged that "the student" (alleged target) has been abused, intimidated, humiliated and bullied at the Green Meadow School by both students and staff ("Alleged Aggressors") The complaint alleges that the issues were not addressed and that reports or investigations were not filed.

Further, they asserted that a paraprofessional and teacher in Kindergarten, the 1st grade teacher, and the 2nd grade teacher all abused, intimidated, humiliated and bullied "the student". I asked who addressed their concerns and they said the teachers and assistant principal had addressed their concerns, but not to their satisfaction.

I asked them if they relayed their recent complaint that the assistant principal was covering up the teacher behaviors with the principal and they said they had not addressed these issues with the principal. I explained the Maynard School Committee Policy #215 Public Complaints/Concerns to them (Attachment #1). Under this policy the correct protocol is for the ▮▮▮▮▮▮▮▮▮ to address their concerns with the principal who would begin a bullying investigation once it was brought to her attention.

1

The ████████ demanded that the student not return to the classroom with the alleged aggressor and we discussed the possibility of placing the student in a small special education self contained classroom temporarily. We told them we would ask the principal to look into this potential solution to their concern. This is the first year of employment in Maynard for the Director of Student Service so she does not know all of the students with IEPs yet. Our assumption was that if a special education advocate was with them, that the student was in need of special services. When we talked to the principal, we found out that the student has never qualified for Special Education Services. The student was also tested with the WIDA assessment to determine if the student would qualify as an English Learner and she does not qualify as an English Learner. Realizing that the student is academically on target, it would be academically unsound to place her in a small self contained special education classroom. As a result, that option was withdrawn.

Two factors have slowed the investigation. The ████████ have refused to bring "the student" in to meet with the principal for questioning as part of the investigation. The result is that the principal has had to use the BRIEF STATEMENT OF CURRENT CONCERN(S) on the PROBLEM RESOLUTION SYSTEM OFFICE INTAKE INFORMATION FORM as the bullying complaint without having the opportunity for the parents or student to provide any witnesses and more detailed information to their allegations. The alleged aggressor has requested representation from the Massachusetts Teacher Association during the principal's questioning of the teacher. The investigation should be complete by the beginning of next week and it will be forwarded to all involved as required by the Maynard Bullying Prevention and Intervention Plan.

A statement of activities completed in the review

Since the Bullying investigation will not be complete until after the deadline for this review, I will focus on the activities of the building administration and central office in regard to the handling of this complaint.

- I met with the parents and advocates on May 23, 2017;
- The principal offered the parents a safety plan in an email on May 29, 2017 (Attachment #2);
- The parents refused to send "the student" in the attached email dated June 2, 2017 (Attachment #3);
- The principal provided home tutoring as an optional safety plan, which the parents accepted;
- I reviewed the emails attached to the PROBLEM RESOLUTION SYSTEM OFFICE INTAKE INFORMATION FORM and other emails where the principal and teachers were suggesting that the student was actually the aggressor at times in peer aggression with different children through the years. It was also identified that in one instance, the student was the aggressor with another student with significantly less cognitive ability;
- On June 20, 2017, I interviewed the assistant principal. She shared gifts the family and student had given her over the years and a letter dated April 7, 2017 from the ████████ praising the efforts of the teacher who is one of the accused aggressors as of my meeting on May 23, 2017 (Attachment #4).

Responses to the information you requested on Page 2.

1. Specific information about reports of bullying or retaliation directed at the student that the district received during the past calendar year including date(s), person(s) involved, and description of incident(s)

- I reviewed the emails attached to the PROBLEM RESOLUTION SYSTEM OFFICE INTAKE INFORMATION FORM and other emails from the ▮▮▮▮▮▮▮▮ family and the first mention of bullying was in an email dated April 14, 2017 at 10:18 a.m.

2. Specific information about the actions the District took:
(a) respond to these reports of bullying or retaliation during the past calendar year, including any investigations related to known incidents, date(s) of investigation(s), and result(s), including the District's determination of whether bullying or retaliation occurred:
- The teachers and administration did not receive a bullying complaint until April 14, 2017;
- After the ▮▮▮▮▮▮▮▮ meeting with me on May 23, 2017, the principal was notified to begin a bullying investigation; and,
- The bullying investigation will be complete next week.

(b) Communicate with the parent or guardian of the alleged aggressors, including a log of communication(s) and a copies of any correspondence related to these allegations:
- The bullying investigation will be complete next week with this information as part of the Maynard Bullying Report Form.

(c) restore the student's sense of safety and prevent additional acts of bullying in the past calendar year.
- The principal provided home tutoring as an optional safety plan which the parents accepted. This helped the student to complete the school year.

3. Describe the results of each of these actions.
- The home tutoring helped the student to complete the school year.

Any corrective action taken by the district with completion dates
- During the six years that I have been Superintendent in Maynard we have reviewed and updated the Bullying Prevention and Intervention Plan twice in 2013 and in 2015 as required by law. Every year I make sure that I am clear in Maynard Leadership Team meetings at the beginning of the year that if anyone even whispers the word bullying, an investigation must take place and proper documentation must be written;
- A workshop for the Maynard Leadership Team with a presentation from the school district attorney on investigation protocols is scheduled for July 13, 2017. This will reaffirm all investigations being handled consistently across the district;
- I interviewed the Green Meadow Assistant Principal on 6/20/2017; and,
- The Green Meadow Assistant Principal, who is a retired administrator, will no longer be employed by the Maynard Public Schools as of July 1, 2017.

Copies of supporting documents.

- See the four attachments.

If I can be of any further assistance, please feel free to email or call my office.





**School Committee Policy:** #215

### Public Complaints/Concerns

In a dynamic and responsive school system, the School Committee, Administration, Teachers and staff will work together to foster free and open interchange of information and ideas with the community. The regular sharing of differing points of view, compliments and concerns is one hallmark of a healthy organization.

At times, a parent/citizen may become sufficiently concerned over a situation in the schools to seek to have a change made or to have some corrective action taken. In such cases, the person is encouraged to share concerns with the appropriate school personnel. It is understandable that pursuing a complaint or concern may be an emotional experience, as well as the event or situation that leads to the complaint or concern. Parents/citizens are reminded that the teachers, staff and administrators of the Maynard Public Schools shall be treated with the respect and dignity that they themselves would also expect to receive. Any disrespect or harassment of a teacher, staff member or administrator will not be tolerated.

The Maynard School Committee believes that: a. complaints are best received and resolved on a person-to-person basis as close to the origin of the concern as possible; and b. the professional staff should be given every opportunity to consider the issues and attempt to resolve a problem prior to involvement by the School Committee. Therefore, the proper channeling of complaints involving personnel, curriculum, or school operations, will be the administrative staff identified in items 1 through 4 in the list below, with the Superintendent being the highest position of authority on these matters. The proper channeling of complaints involving school finance, school committee policy, or the supervision and hiring of the Superintendent will start at the person to person level with successive remedies sought through the full list (1 through 5) below with the School Committee as the ultimate authority on these matters:

1. Citizen to Teacher/staff member
2. Citizen to Building Administrator, Special Education Department Chair
3. Citizen to Assistant Superintendent/Curriculum Director, Director of Student Services, or Business Manager, (as appropriate)
4. Citizen to Superintendent
5. Citizen to School Committee

The Maynard School Committee expects the professional staff to receive complaints courteously

and to make proper reply within five working days to complainants, whenever possible. **Every effort will be made to encourage citizens to follow the sequence of complaints.** Copies of this policy and all school committee policies are available on the school department website at www.maynard.k12.ma.us under the School Committee pull down menu.

No member of the community will be denied the right to bring an appropriate complaint to the Maynard School Committee. However, all complaints brought to the School Committee will be referred to the Superintendent for resolution prior to investigation or action by the School Committee. Exceptions will be made only when complaints concern School Committee actions or School Committee operation. On those matters where the School Committee has jurisdiction over an issue, if the concern has been presented at a lower level and adjusted at that level before being appealed to the School Committee, a report of the disposition of the matter will be made promptly by the Superintendent to the School Committee.

Current Version: 1/22/2015
Earlier Versions: 11/06, 3/00, 4/98, 9/94, 9/93, 10/88



### *Green Meadow School Safety Plan*

Student Name ████████
Grade  2
Prepared by Donna Dankner, Principal

Date   May 29, 2017
Teacher  Mrs. Holly

**Expressed Concern:**

Mr. and Mrs. ████████ have expressed concern that their daughter does not feel safe in school as a result of comments and actions directed toward her.

**Action Steps:**

- A comprehensive investigation of all concerns raised in regard to bullying and safety will be conducted in accordance with the Maynard Public Schools Bullying Intervention and Intervention Plan.
- An immediate interim safety plan will be implemented to facilitate ████'s safe return to school while the bullying investigation is being completed.
- A meeting will be scheduled with Mr. and Mrs. ████████ to specifically outline their concerns and gather details of the issues raised to enable a comprehensive bullying investigation to take place.

**Safety Plan:**

- A specific staff member will be identified as a safe person who will be assigned to work directly with ████ throughout the day. This staff member will be with her in class and accompany her to all specials and school events.
- This staff member will be instructed to carefully monitor interactions and intervene as needed to support her safety throughout the day.
- This staff member will also maintain a separation between ████ and students who have been identified as bothering her.
- Recess staff will be identified to carefully monitor playground interactions, intervening and guiding as needed.
- The School Adjustment Counselor, Ms. Rutherford and the School Psychologist Amy Schwarz will be identified as additional staff members to monitor, providing ████ with support and assistance as needed throughout the day.

**Additional Information:**

- This safety plan is a revision of the initial plan considered. After review of the academic considerations and following consultation with the Director of Student Services, this recommendation is deemed appropriate to maintaining student safety and providing access to curriculum.

Principal Signature _____   Date _____

Parent Signature _____   Date _____

Parent Signature _____   Date _____

# tiGerM il

**Robert Gerardi** <rgerardi@maynard.k12.ma.us>

## Fwd: Safety plan
1 message

**Donna Dankner** <ddankner@maynard.k12.ma.us>     Fri, Jun 2, 2017 at 9:55 AM
To: Robert Gerardi <rgerardi@maynard.k12.ma.us>

Sent from my iPhone

Begin forwarded message:

> **From:** ▓▓▓▓▓▓▓▓▓▓▓▓
> **Date:** June 2, 2017 at 8:58:03 AM EDT
> **To:** Donna Dankner <ddankner@maynard.k12.ma.us>
> **Cc:** Craig Haller <craig@spedadvocate.com>, ▓▓▓▓▓
> ▓▓▓▓▓▓▓▓▓▓▓, Carol Gahan
> <cgahan@maynard.k12.ma.us>, Jennifer Gaudet
> <jgaudet@maynard.k12.ma.us>
> **Subject:** Re: Safety plan

Mrs. Dankner: Due to the severe traumatic experience for the past
2 years with the Green Meadow school staff, ▓▓▓▓ will not
participate in any investigation conducted by your school staff or
the Maynard Public Schools District. Meanwhile, ▓▓▓▓ is working
with a mental health specialist to recover from the post-stress
consequences.

The names of the aggressors and involved persons you requested:

**Donna Dankner** - subject to investigate the consistent violation by
yourself and your staff section 37O of chapter 71 of the General
Laws
https://malegislature.gov/Laws/GeneralLaws/PartI/
TitleXII/Chapter71/Section37O
and
https://malegislature.gov/Laws/SessionLaws/Acts/2014/Chapter86

**Deborah Bresnick** - *ignored received multiple signals (verbal and written). Did not address the signals according to the bullying prevention law.*
**Candace Adamson** - *biased, unprofessional handling of daily school issues with students, threatening, blackmailing attitude. The incidents are described in the emails sent to you personally a year ago*
**Mrs. Corcoran** (1st grade teacher assistant) - *biased, abuse of power*
**Deb Holly  (2nd grade teacher)**  - *biased, publicly shamed and intimidated████ abuse of power, bullied and unfairly treated ████, slander*
**Katie LeBlanc** - *ignored health complaints, false testimony to cover Mrs. Holly's abuse of power*
**Leslie Dowst** (school nurse)  - *ignored ████'s health complains and requests to call parents*
**Mrs. Janice** (Bus Driver line # 4)  - *biased, abuse of power, slander*

The number of incidents with students involved are well-documented in the email you and your staff received from me. Please use search functionality in your mail client. In case your intentionally or incidentally deleted them from your inbox, you can find their printed copies in the superintendent's office. They were provided to him on May 23rd.

Let us know if you have any more questions.



On Tue, May 30, 2017 at 12:02 PM, Donna Dankner
<ddankner@maynard.k12.ma.us> wrote:
  Dear Mr. and Mrs ████████████,
  I am attaching a safety plan to support ████'s safe return to school while the bullying investigation is in process. Although this plan differs from our original discussion, I believe it will enable her to maintain her academic progress while feeling safe in school.

  In order to capture the scope of your concerns, it is important for me to to have in writing the exact details directly from you. I welcome the opportunity to hear your perspective regarding the specific incident information and witnesses to these occurrences in order to adequately address all concerns. I would ask you to please identify:

1. Who are the individuals that are being identified as bullies?
2. What are the specific incidents and when did each of the incidents occur?
3. Who were the witnesses that observed each of these incidents?

As I mentioned previously, I am available to meet tomorrow morning, May 31 at 9:00 am for me to fill in the form on your behalf. If you prefer to write the information yourself instead of meeting, you can complete the form using the link provided and submit it to me.

https://drive.google.com/file/d/0BzKkQ4hQN3RbZzdkNTRGaG44eW8/view

Please know that the safety and well being of each student at Green Meadow is my primary concern. I want to work together to resolve any concerns and have ▮▮▮ enjoy a positive school experience.

Sincerely,
Donna Dankner

Donna Dankner
Principal
Green Meadow School
5 Tiger Drive
Maynard, Mass.
978-897-8246

ddankner@maynard.k12.ma.us

Dear Mrs. Dankner!
Dear Mrs. Bresnik!

This is to express my most sincere gratitude
for the teacher and class choice this year
for our daughter ▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓
Remembering last year's negative experience
with her 1st grade teacher, we wish to kindly
ask you to pick a 3rd grade teacher, who
would be as competent, empathetic, thoughtful
as mrs. Holly is!
As per student placement matter, I would also
ask you to eliminate any chance of ▓▓▓▓
placement with:
▓▓▓▓▓▓▓▓▓▓▓▓
▓▓▓▓▓▓▓▓▓▓▓▓
▓▓▓▓▓▓▓▓▓▓▓▓

We do thank you for your thoughtfulness
professionalism and humane attitude
for our family who's had a
tough immigration experience since 2007.

Sincerely, ▓▓▓▓▓▓▓▓▓          04/07/2017

# EXHIBIT C

*The Maynard Public Schools are committed to a superior academic experience for Maynard's students that prepare them to be productive citizens in an interconnected technological world.*



## MAYNARD PUBLIC SCHOOLS
www.maynardschools.org
*jgandat@maynard.k12.ma.us*
3-R Tiger Drive
Maynard, Massachusetts 01754
*Jennifer Gandat*
*Assistant Superintendent for Curriculum, Instruction, & Assessment*
978-897-2222

Dear. Mr. Krakow,

This is my follow-up report to the report submitted by Dr. Gerardi on June 22, 2017. This relates to complaint 17-0928.

To compile this report I met with the following individuals:
- Deb Holly, Teacher- Alleged Aggressor
- Student B, Student- Alleged Aggressor
- Parent/Guardian 2 of alleged aggressor, Student C.
- Lois Cohen- Witness
- Donna Dankner- Principal and initial investigator
- Robert J. Gerardi, Jr.- Superintendent, author of initial report

Deb Bresnick- Alleged Aggressor, has retired and no longer works for the district. The position was cut for financial reasons Ms. Bresnick is out of the country until August 15, 2017. She will be interviewed upon her return.

During the initial investigation, the alleged target's family was contacted to participate. The parents indicated via email that the alleged target would not be participating further in the investigation. The family indicated that email evidence of the alleged target's observations would suffice. This was repeated in the legal communication received by the school district's attorney on July 13, 2017 seeking that the district reopen the investigation. We have abided by the wishes of the alleged target's family and have not contacted her for an interview during the follow-up investigation.

I reviewed all emails related to ███████████████ I explicitly examined the emails related specifically to the events listed in the legal communication from ████████'s attorney, Tiffany E Haines, Esq. dated July 13, 2017.

Responses to your request for information follow.

**1. Specific information about reports of bullying or retaliation directed at the student or retaliation:**

Incidents related to bullying were investigated in the Bullying Report by Donna Dankner completed June 29, 2017. See ATTACHED. This report addresses alleged incidents not addressed in the initial investigation. The first alleged incident was discovered in an email search. This email, dated November 4, 2016 appears to be the first use of the word "bully" related to ▇▇▇.

**Incident I: Inappropriate interaction between a student (potentially "Student A") and ▇▇▇ during an after-school art class.**

In an email dated November 4, 2016, Ms. ▇▇▇▇▇▇ indicates that she believes a boy is "acting like a bully" to ▇▇▇. Between 10:50 AM and 2:40 PM, Ms.▇ and the director of the EXCEL after-school program, Ms. Lois Cohen, emailed multiple times. Ms. Cohen indicated she had been made aware of the issue and "it is [SIC] being addressed," and offered to speak with Ms. ▇▇▇▇▇▇. Ms. ▇▇▇▇▇▇ indicated that she would call. The next email in the chain is from November 10, 2016 where Ms. ▇▇▇▇▇▇ indicated that she felt the boy, "Student A" was acting similarly.

In speaking with Ms. Cohen, she was not able to recall the incident specifically. She thought that the incident involved a student calling ▇▇▇ a name. She said if that was the case she would have spoken to the boy and would have spoken to the classroom instructor to ensure they were aware of the incident. She does not recall this being an ongoing issue.

**Conclusion:** Inconclusive. The email evidence seems to indicate that there were two incidents with the same children. The imbalance of power was unable to be determined. The targeting was unable to be determined.

In the legal communication from Attorney Haines, she indicates 31 dates going back to March 15, 2016 as evidence of alleged inaction by district and school administration. Based on my investigation, it appears that 26 of those dates occurred during the 2016-2017 school year. As the Problem Resolution System Complaint System retains jurisdiction over events during this school year, this report relates to the seven dates, representing 4 distinct incidents, 3 of which were not investigated as part of the initial bullying complaint. Italicized text represents allegations as made in the legal communication from Attorney Haines. I have grouped the allegations by incident, with the summary of findings under each incident.

**Incident II: Inappropriate comments regarding ▇▇▇'s clothing made by Student B:**

*October 26, 2016: Mrs.* ███████ *sent an email to Ms. Holly, asking her to address an incident yesterday where a student, Student B, made inappropriate and hurtful comments about* ███*'s clothing. Mrs.* ███████ *stated that* ███ *is upset about finding clothes to wear to school now. Ms. Holly responded by stating that she resolved the situation directly by speaking with Student B and* ███.

In discussing this incident with Ms. Holly, she was unsure what the specific incident related to. She did state that she had multiple conversations with Student B regarding her discussing ███'s outfits. In her estimation, Student B was attempting to show admiration for ███'s outfits, but did so in an inappropriate way. Ms. Holly stated that she had ███ explain how Student B's comments made her feel and Ms. Holly asked Student B to apologize. Ms. Holly stated that ███ still did not feel the incident was resolved, so Ms. Holly suggested that should this happen again, ███ should tell Student B not to comment on her clothing.

Student B stated that, when she commented on ███'s clothing, she was stating that she (Student B) did not like to wear the type of outfit that ███ was wearing. When asked directly if she was attempting to make ███ feel badly, Student B affirmatively answered "no." Student B's mother interjected at this time and prompted Student B to discuss the incidents when girls were wearing dresses or skirts. Student B mentioned that when ███ wore a dress or a skirt, she would sit at circle in such a way that "took over spots." When Student B made this concern known to ███, ███ responded "who cares, I am still doing it." Student B's mother stated that Student B had asked to wear her Christmas dress to school on one occasion. When Student B's mother asked why, Student B stated that "when you wear skirts or dresses you get more room in circle."

In reviewing the emails associated with this incident, it appears that Ms. ███ was satisfied with Ms. Holly's response, stating, "Fabulous, love your promptness! Thanks!" in an email on October 26, 2016.

**Conclusion:** After reviewing all of the information regarding this incident, there does not appear to be an imbalance of power between the two girls that would have led to a bullying designation.

## Incident III: Public Shaming due to alleged inappropriate lunchroom behavior

*December 2016:* ███ *was publicly shamed and humiliated by teachers and staff, who forced* ███ *and Student B to clean up the entire Cafeteria during lunch time of all kindergarten and first grade students. No other students were punished except for* ███ *and Student B (it was alleged that Student B was running and* ███ *was walking too quickly in the cafeteria during lunch).*

Ms. Holly clarified that this incident actually occurred in November 2016. Ms. Holly stated that the girls were fooling around, laughing, running and jumping in line waiting to go the cafeteria. Ms. Holly indicated that the laughing and giggling continued and that they had ignored the lunch aide and classroom aide. Ms. Holly determined that they

should do an "apology of action" to right the wrong. The next day Ms. Holly indicated that, at the request of the lunchroom aide, the two girls were asked to assist the lunch aide in helping open milks and straws for the first graders and Kindergarteners during the second grade recess. Ms. Holly indicated the girls were helpful for five minutes or so, and then continued to be rude and disrespectful to the lunch aide. When asked if she had used this type of "apology of action" with other students Ms. Holly indicated that she often would have the entire class remain behind the other classes if their table was not picked up appropriately or if some other disturbance had occurred.

When asked about this event, Student B indicated that the girls were asked to pick up trash and wash the tables during lunch.

Emails related to this incident indicate that both Student B's mother and Ms. ████████ were informed of the behavior and responded indicating that the girls seemed to feed off each other negatively. Both Ms. ████████ and Student B's mother encouraged separating the two girls during school. In a separate string of emails to Ms. Holly, Ms. ████████ indicated that ████ felt "very miserable that her good and endeavouring actions are less noticed than misbehaviour..." and asked what can be done. Mss ████████ referenced the difficulties the family had the previous year. Ms. Holly responded stating that ████ was lucky to have the mother she does, and that they will continue to work together, teacher and parents, to figure out how to help both girls move forward.

**Conclusion:** After reviewing the information related to this incident, it does not appear that Ms. Holly singled out or targeted these two girls for a type of consequence that she did not use with other students. Therefore, this does not meet the definition of bullying.

### Incident IV: Unfair accusation and consequence due to alleged inappropriate lunchroom behavior

*January 12, 2017: Ms. Holly sent an email to Mrs. ████████, requesting to meet on January 17, 2017 to discuss ████'s alleged misbehavior at lunchtime, and stating that she (Ms. Holly) will be having ████ and Student B write a note of apology to Ms. LeBlanc (teacher's aide). Mrs. ████████ responded and agreed to meet, but clarified that she (Mrs. ████████ spoke to ████ about the incident and ████ confirmed that she was not misbehaving.*

*January 13, 2017: Ms. Holly sent an email to Mrs. ████████ disagreeing with ████'s version of events at lunch time. Mrs. ████████ responded by thanking Ms. Holly and requesting to discuss the incident with Ms. LeBlanc as well.*

*January 16, 2017: Mrs. ████████ sent an email to Ms. Holly asking for ████'s side of the story to be heard, since ████ refutes all the allegations about her alleged misbehavior at lunch time. Mrs. ████████ expressed concern that ████'s love of school is being ruined by all the false allegations.*

Ms. Holly indicated that both girls did not respond to multiple attempts by the classroom aide to change their behavior. After one such request, Student B responded, "FINE." Ms. Holly indicated that ████ laughed at Student B's response. Ms. Holly indicated that as this was the second lunch incident involving the same girls for similar behaviors, a meeting was called with the parents, Ms. Holly, and Ms. Bresnick. At this meeting, Ms. Bresnick indicated that she would be asking both children to write a letter of apology. Mrs. ████ asked what cafeteria rule(s) ████ was alleged to have broken. Ms. Holly indicated that Ms. Bresnick responded, stating that "what that means is children are polite and respectful in the cafe and eat their lunch. They are not fooling around when a teacher asks them to calm down." Ms. Holly believes that the parents indicated at that meeting that ████ would not be writing a letter of apology.

Emails related to this incident indicated that Ms. ████ is concerned that ████ is being unfairly accused of being rude to the classroom aide, as ████ indicated that Student B was the one who had responded inappropriately. ████ had indicated to her mother that she had sat silently during this incident.

**Conclusion:** This incident appears to combine several factors that may have led to its negative conclusion. First, it appears that the family, and perhaps ████, did not understand that the alleged rudeness stemmed from both inattention to a teacher's direction as well as from ████'s reaction to Student B's comments. During Ms. Holly's interview, she mentioned repeatedly that both girls were not responding to requests by the classroom aide to change their "silly" behavior. The ████ family, in both emails and in the attorney document, repeatedly focus on Student B's verbal response to the aide, indicating that ████ did not verbally respond to the aide in a rude manner. The questioning by the father at the meeting indicates that he is seeking clarity on what rule ████ is alleged to have broken. The common factor is a difference of understanding as to what represents a "rude" response. In multiple emails earlier in the year Ms. ████ expressed concern that the family's ████ background made it challenging for them to understand actions or events in the schools. It is reasonable to conclude that the teachers and administration maintained a different understanding of what behavior warrants a "rude" designation than did the family. While it is clear that the family believes their daughter to have been targeted, the intent of the teachers and administration was to address the issues. This does not represent a targeted action or an intent to cause harm. This, therefore, does not meet the definition of bullying.

**Incident V: Unfair accusation, inappropriate punishment, and lack of consistency in punishment related to teasing.**

*April 13, 2017: Ms. Holly sent an email to Mrs. ████ stating that ████ was teasing a male student named Student C during recess, and that she is making ████ write a letter of apology and sending home a behavior form for Mrs. ████ to sign. Mrs. ████ responded to clarify that ████ did not tease Student C, but was actually being called names by him, and that Ms. Holly did not give ████ a chance to tell her side of the Story. Ms. Holly responds by stating that ████ is not innocent and all*

*students involved are being punished. Mrs. ▮▮▮▮▮▮ responds and asks why the other students are not being forced to write an apology note like ▮▮▮▮*

This incident was addressed in Mrs. Dankner's earlier bullying investigation. Student C was not interviewed for that investigation, however, I sought to speak with Student C regarding his relationship and interactions with ▮▮▮▮. Unfortunately, I was only able to speak with Parent 2. She did not recall either incident with Student C. When I asked if her if Student C ever mentioned ▮▮▮▮▮▮ or Student B, she said he had not.

## 2. Specific Information on District Actions:

Principal Dankner's report indicates the actions that were taken as a result of the incidents identified in the initial investigation. Through my investigation it appears that similar responses were made to the earlier incidents not included in the initial report. Upon each notification of a teacher or administrator by Ms. ▮▮▮▮▮▮ teachers and administrators used "Responsive Classroom" strategies to help students resolve conflict and take ownership over their contributions.

It is clear through my investigation that the parent/guardian for the alleged aggressor involved with the majority of the incidents was continually contacted by teachers and administrators and remained an active participant to try and solve the negative interactions between the girls. The other student aggressor, Parent 2 did not recall being contacted in relation to these incidents. As she shares guardianship with Student C's grandmother, she could not definitively state that the grandmother had not been contacted.

In the Problem Resolution System complaint the family states that a safety plan was promised by May 24 and was never set. At the meeting between Ms. Dankner, Advocate Haller, and Mr. and Ms. ▮▮▮▮▮ a tentative safety plan of putting ▮▮▮ in a subseparate classroom and attending specials with a new class for the remainder of the year was discussed. Email records also indicate that Ms. Dankner immediately began to set up the safety plan as discussed with the family, however concerns were raised about the appropriateness of the plan. In speaking with Ms. Dankner she indicated the team determined that the initial plan was not viable in that it would have placed ▮▮▮ in an environment that would not have allowed her to access curriculum at the appropriate level. The sub-separate classroom proposed would not have been the least restrictive environment in which to educate ▮▮▮. Instead, email records indicate that a safety plan was sent to the parents on May 30, 2017 at 12:02 PM. This plan included a full-time safe person to be with ▮▮▮ throughout the school day. Ms. ▮▮▮▮▮ responded to the email on June 2, 2017 by stating that ▮▮▮ would not be participating in any investigation conducted by the Maynard Public Schools and its staff. She listed the names of alleged aggressors, but did not address the safety plan. After a conversation with the family's advocate, a new safety plan of tutoring was established and accepted on June 6, 2017. This plan included home tutoring by a certified teacher, employed by the district as a Title I tutor, ensuring that ▮▮▮ was provided with curriculum appropriate to

her grade level and development. Additionally, tutoring in the home guaranteed both the sense and actual safety sought by the family.

At the conclusion of the initial investigation, Ms. Dankner indicated that several actions would be followed to ensure that ████'s sense and physical safety would be protected during the 2017-2018 school year. These included:

- Placing ████ in a class apart from the students mentioned in the bullying report and emails.
- Forming a relationship between ████ and the school adjustment counselor to establish a safe and trusting adult relationship
- · Having the school adjustment counselor act as a "safe person" for ████ to report any future incidents or concerns.

The complaint also seeks the district to conduct a "Full and fair bullying investigation into the actions of both students and teachers who were aggressors in many of the situations." It is my opinion that, in regards to the incidents identified in this complaint, the school district has fully and fairly investigated the allegations at this time. An initial investigation was completed by Ms. Dankner and a letter indicating the findings was sent to the family on June 29, 2017. See ATTACHED. After receiving communication from Attorney Haines, the district agreed to review the findings of the initial investigation with the additional information provided in the communication. At the time of this report, the investigation into bullying for the 2016-2017 school year has been completed and affirms the initial findings of the first investigation completed by Ms. Dankner. In an abundance of caution, the school district will investigate the incidents alleged to have occurred during the 2015-2016 school year. Due to schedules over the summer months, interviews for those students and teachers were not possible prior to the submission of this report.

## 3. Results of these actions

Ongoing efforts by Maynard Public Schools faculty and staff to investigate and address the concerns raised by Ms. ████ throughout the year did not meet Ms. ████'s expectations and her concerns remained. Upon completion of a formal bullying investigation, ████ was providing with home tutoring to finish the 2016-2017 school year, addressing the concerns raised in the complaint. Additionally, Ms. Dankner has made arrangements for specific actions to be taken at the start of the 2017-2018 school year to ensure ████ is able to attend grade 3. These include a class away from both alleged aggressors and a connection with the school adjustment counselor to act as a safe person throughout the year.

The district reviewed the findings presented in the initial bullying report at the request of the family. This new investigation has affirmed the finding of "no bullying" for the 2016-2017 school year. The district will continue to investigate the incidents raised in the 2015-2016 school year and will try to reach a conclusion on these allegations as soon

as is practical. Regardless of the findings of that investigation, ▓▓▓ will be provided with resources and supports mentioned above for the 2017-2018 School year.

Separate and apart from this investigation, the district will be taking several actions during the 2017-2018 school year to address concerns such as those raised in this complaint. Those actions include:

1. Training by legal counsel for administrators in conducting thorough investigations. This occurred on July 13, 2017.
2. Specific professional development for faculty and staff responsibilities when bullying or concerning behavior is reported to them. This will occur on August 28, 2017.
3. More in-depth professional development on identifying and reporting bullying for all faculty and staff. This will occur on August 28, 2017 and throughout the year at faculty meetings in each building.
4. Implementation of a Positive Behavioral Interventions and Support (PBIS) system by starting year one of a three-year implementation process in the 2017-2018 school year. We will be seeking entry into the PBIS Academy through the NEAG School of Education at the University of Connecticut. At a cost of $15,000.00, this academy will provide resources and training to ensure a successful implementation.
5. Ongoing cursory and in-depth training on Collaborative and Proactive Solutions for faculty and staff in the Maynard Public Schools. This system seeks to help faculty and staff identify what skills students exhibiting problematic behaviors are missing and provide strategies to help build those skills.

I appreciate the additional time that you have provided to the district to allow it to investigate the new information provided by the complainant. It is our continued hope that we can resolve the concerns of the ▓▓▓▓▓ and for ▓▓▓ to remain an active part of the Maynard Public Schools community.

Sincerely,

Jennifer Gaudet
Assistant Superintendent
Maynard Public Schools

# EXHIBIT D



## Shapiro Law Group, PC

August 17, 2017

**VIA FEDERAL EXPRESS & E-MAIL**

Paula Twomey
MA Department of Elementary & Secondary Education
75 Pleasant Street
Malden, Massachusetts 02148-4906

Re:   Intake No. 17-0928
      Student Name: ▇▇▇▇▇▇▇▇▇

Dear Ms. Twomey:

Please accept this correspondence in response to the follow-up report submitted by Jennifer Gaudet, Assistant Superintendent of Maynard Public Schools on or around August 10, 2017 in relation to Complaint No. 17-0928.

In the interest of clarity, I would like to reiterate the relevant background of the Complaint filed by my clients with the Massachusetts Department of Elementary and Secondary Education ("Department") based on the incidents of bullying and retaliation suffered by their daughter, ▇▇▇▇▇▇▇▇▇▇▇▇▇ while she was a student in Maynard Public Schools ("Department").

▇▇▇▇ attended the Green Meadow School in Maynard from September 2015 through May 2017. Beginning in 2015, Mr. and Mrs. ▇▇▇▇▇▇▇▇▇ made numerous reports to teachers, administrators and the Superintendent of the District, Dr. Robert Gerardi, Jr. When their reports were ignored, Mr. and Mrs. ▇▇▇▇▇▇▇▇ filed a Statement of Concern with the Department with the assistance of an education advocate on or around May 29, 2017. Based on the allegations in the Statement of Concern, Joel Krakow, PRS Specialist, sent correspondence to Dr. Gerardi on June 7, 2017, requesting that Dr. Gerardi review this matter and report on any identified concerns. In response, Dr. Gerardi submitted his Local Report to the Department on June 22, 2017.

My Firm was retained to represent the interests of Mr. and Mrs. ▇▇▇▇▇▇▇ on or around Friday, June 23, 2017. I promptly sent correspondence to Dr. Gerardi and Mr. Krakow on June 27, 2017, to place both the District and the Department on notice that I was in the process of reviewing the documents exchanged regarding the Statement of Concern and intended to prepare a formal response. I received a response from Andrew J. Waugh, Esq. on July 3, 2017, confirming receipt of my letter and advising me that he represented the District. After reviewing the history of this matter and all available documentary evidence, I submitted a formal response and demand on behalf of my clients on July 13, 2017.

Tel. 339.298.2300          300 Trade Center, Suite 3700          F. 339.298.2099
                           Woburn, Massachusetts 01801                    1
                           www.shapirolegal.com

On July 14, 2017, I received a letter from Attorney Waugh, enclosing the results of the District's initial bullying investigation. The letter from Attorney Waugh stated that "[a]fter investigating the matter, the principal concluded that no evidence of bullying actions were found." This letter was dated July 12, 2017 and sent prior to receiving my clients' response to the Local Report issued by Dr. Gerardi, as specifically stated in my correspondence sent to Attorney Waugh on June 27, 2017.

The investigation findings were issued by Principal Danker and were purportedly made after "extensive examination of documentation" and "detailed interviews." However, the District neglected to provide any details on the investigation and failed to review the documentation submitted by my clients before closing out their investigation. The District also failed to recognize that the Department has time standards of sixty (60) days for responding to complaints, and my clients had the right to submit additional documentation in support of their claims during this period.

I sent e-mail correspondence to Attorney Waugh on July 14, 2017, requesting that the District reopen its investigation, which was closed prematurely and without considering all available evidence. I also sent e-mail correspondence to Mr. Krakow on July 18, 2017, advising of our request for the District to reopen its investigation and stating concerns about how the District has been negligent in its handling of this matter. In a letter from Attorney Waugh dated July 19, 2017, it was confirmed that the District had decided to conduct a more in-depth investigation and would carefully review all documentation submitted by Mr. and Mrs███████.

Based on the District's decision to conduct further investigation, I received a telephone call from Paula Twomey, Educational Specialist Supervisor, inquiring whether my clients would be amenable to an extension on the deadline for the Department to issue its decision. Despite being concerned about the delay caused by the District, Mr. and Mrs. ████████ agreed to a two-week extension, to ensure that the Department had all the information it required to make an informed decision in this matter. In a letter from the Department dated July 28, 2017, it was confirmed that my clients would receive either a Closing Letter or a Letter of Finding no later than August 11, 2017.

Despite the clear timeline in the Department's extension letter, the District did not issue further findings until mid-afternoon on Thursday, August 10, 2017. My clients had made known to the Department their concerns about timing, given that school resumes in less than one month and ████ does not have a school placement. Mr. and Mrs.████ are firm in their position that their daughter cannot return to Maynard Public Schools due to her prior traumatic experiences at the Green Meadow School, and they are not amenable to the home-tutoring previously offered by the District. ████████ was only offered three (3) days of tutoring even though she left school for safety reasons on or around May 18, 2017. Mr. and Mrs.████████ have been under significant distress trying to cope with the trauma experienced by their daughter and the uncertainty of her school placement this year. The stress of this situation has been compounded by the fact that my clients are

having another baby this month. Mr. and Mrs. ██████ have not been able to focus on what should be a joyous event due to the mishandling of this matter by the District.

While the District found the allegations of bullying to be unsupported, their investigation is flawed in numerous respects. In the Final Report, there was no mention of why the District failed to file Bullying Prevention and Intervention Incident Reporting Forms in response to the multiple complaints they received from my clients, as required by the Maynard Public Schools Bullying Prevention and Intervention Plan. I have provided additional examples below, corresponding to the paragraphs in the letter from Assistant Principal Gaudet.

1) Specific information about reports of bullying or retaliation directed at the student or retaliation.

Ms. Gaudet states that the first alleged bullying incident occurred on November 4, 2016, as this "appears to be the first use of the word 'bully' related to ██████." Under G.L. c. 71, §37O(a), "bullying" is defined as:

> "the repeated use by one or more students or by a member of a school staff, including, but not limited to, an educator, administrator, school nurse, cafeteria worker, custodian, bus driver, athletic coach, advisor to an extracurricular activity or paraprofessional of a written, verbal or electronic expressional or a physical act or gesture or any combination thereof, directed at a victim that: (i) causes <u>physical or emotional harm</u> to the victim or damage to the victim's property; (ii) places the victim in <u>reasonable fear of harm</u> to himself or of damage to his property; (iii) creates a <u>hostile environment</u> at school for the victim; (iv) <u>infringes on the rights</u> of the victim at school; or (v) materially and substantially <u>disrupts the education process</u> or the orderly operation of a school." (emphasis added).

There is no requirement that the word "bully" be used for a finding that bullying has occurred, only that there are repeated instances of the actions that meet the criteria for bullying under the Statute. My clients provided the District with e-mails dating back to March 15, 2016, where Mrs. ██████ contacted ██████'s first grade teacher, Candace Adamson, to report that ██████ was threatened with physical harm during an incident that occurred on the school bus. Mrs. ██████ expressed displeasure with how this incident was handled by the school. There were additional emails exchanged between Mrs. ██████ and teachers and administrators through the remainder of the school year, where reports are made about ██████ being mistreated by students and staff.

The most egregious incidents of bullying were not fully investigated by the District and addressed in their reports. By way of example, the only mention of the Vernal Pool incident, where ██████ was physically attacked by one of her aggressors, was in the initial report by Ms. Dankner. Ms. Dankner dismissed the incident by stating that there was "no evidence of intentional targeting of ██████ by Student B." In the Final Report, Ms. Gaudet only addressed incidents where ██████ was bullied during the Excel after-school program (this incident was not even raised by Mr. and Mrs. Lyashchenko), where ██████ was teased

about her clothing, and where ▮▮▮ was unfairly treated by teachers. The District failed to address the following incidents detailed in my letter of July 13, 2017: (1) where ▮▮▮ was threatened by one of her aggressors, ▮▮▮▮▮▮, (2) where ▮▮▮ was slapped across the face by ▮▮▮▮▮▮, and (3) where Ms. Holly disclosed the contents of an email written by Mrs. ▮▮▮▮ in front of ▮▮'s entire class.

Ms. Gaudet states in her conclusion about one of the bullying incidents that "Ms. ▮▮ expressed concern that the family's ▮▮▮ background made it challenging for them to understand actions or events in the schools." This allegation is absolutely false, and it is stunning that Ms. Gaudet used my clients' ethnic background and nationality as a means of dismissing the bullying incidents. As clearly stated in my letter of July 13, 2017, Mr. and Mrs. ▮▮▮▮▮▮ and their daughter are from ▮▮▮▮ not ▮▮▮▮. ▮▮▮▮ is a country ▮▮▮▮▮▮ that is completely separate and distinct from ▮▮▮▮. Mrs. ▮▮▮▮ never represented that she was from ▮▮▮▮ and is offended by this mischaracterization of her family's heritage. My clients are of the position that these statements by the District are clear evidence of discrimination that shall not be tolerated in the future.

## 2) Specific information on District Actions.

Ms. Gaudet admits that the original safety plan of placing ▮▮▮ in a sub-separate classroom and attending specials with a new class for the remainder of the year was discussed at the meeting between Principal Dankner, Advocate Haller, and Mr. and Mrs. ▮▮▮▮. Ms. Gaudet further states that Ms. Dankner and her team determined that the safety plan "was not viable" and was not the "least restrictive environment in which to educate ▮▮." Mr. and Mrs. ▮▮▮▮ were not consulted and had no knowledge that the original safety plan had been abandoned until they received an entirely new safety plan on May 30, 2017 (almost a full week after the safety plan was promised). Whereas the new safety plan did not provide adequate protections for ▮▮, Mr. and Mrs. ▮▮▮▮ requested an alternate plan and were offered home-tutoring. After accepting the alternate safety plan, Mr. and Mrs. ▮▮▮▮ learned that their daughter would only receive <u>three (3) days of home-tutoring</u>, even though ▮▮ missed an entire month of school.

## 3) Results of these actions.

Based on the District's new investigation, it has affirmed the finding of "no bullying" for the 2016 – 2017 school year. However, this matter has been mishandled by the District from the beginning. Mr. and Mrs. ▮▮▮▮▮▮ have reported incidents of bullying, harassment, and unequal treatment of their daughter for the past two (2) years. Their concerns were not taken seriously and were not acted upon by the Green Meadow School teachers and administration, including Principal Dankner. The District did not follow proper procedure, as set forth in the District's Bullying Prevention and Intervention Plan, which provides that the "<u>principal or designee will promptly investigate all reports of bullying or retaliation</u>." No investigations were performed and no reports were filed by

Principal Dankner until after Mr. and Mrs. ██████ escalated their concerns directly to Superintendent Gerardi. As a result, ████ continued to endure acts of bullying, suffer humiliation, and have her education disrupted.

It is unacceptable that the investigation by the District has proceeded in such an unprofessional and protracted manner. In a letter dated July 19, 2017, Attorney Waugh inaccurately stated that "the information submitted by the ██████ is untimely." Mr. and Mrs. ██████ have fully complied with their obligations and all applicable deadlines. They filed their Statement of Concern and provided evidence to the Department on May 29, 2017. Pursuant to Department Guidelines and 34 C.F.R. 300.152, my clients were entitled to receive a finding by July 28, 2017. An extension on the time limit may only be granted where "[e]xceptional circumstances exist with respect to a particular complaint." 34 C.F.R. 300.152(b)(1)(i). There were no exceptional circumstances to warrant an extension in this case. Due to the District improperly closing out its investigation before receiving my clients' response to Dr. Gerardi's Local Report, the July 28, 2017 deadline was not met. The extended deadline of August 11, 2017 was also missed due to the delay caused by the District. It is now twenty (20) days past the deadline and my clients still do not have a resolution.

It should not be forgotten that there is an eight-year-old girl who has already suffered two (2) traumatic years in Maynard Public Schools. Mr. and Mrs ██████ have tried repeatedly to address the incidents of bullying and to seek the appropriate recourse for their daughter, but their pleas have been ignored. It is beyond dispute that the District did not respond promptly and equitably to the reports of bullying, harassment, and unequal treatment made by Mr. and Mrs. ██████ As a result of the District's actions, ██ lost two critical years of her education, had to seek mental health counseling, and is without a school placement for the 2017 – 2018 academic year.

I trust that the Department will thoroughly review all of the evidence, consider how my clients' claims were consistently mishandled by the District, and issue a timely decision in this matter. Mr. and Mrs. ██████ have shown great restraint despite the dismissive treatment they have received from the District. My clients cannot afford further delay when their daughter's education is at stake. If they do not receive a decision on or before August 22, 2017, then my clients are prepared to take all necessary actions to defend their daughter's rights, including escalating their complaint to the U.S. Department of Education Office of Civil Rights and filing a private law suit against the District.

Very truly yours,

Tiffany E. Haines, Esq.

cc:   Mr. and Mrs ██████ (via e-mail only)
      Andrew J. Waugh, Esq. (via Federal Express and e-mail)

5

# EXHIBIT E



# Massachusetts Department of Elementary and Secondary Education

75 Pleasant Street, Malden, Massachusetts 02148-4906

Telephone: (781) 338-3700
TTY: N.E.T. Relay 1-800-439-2370

August 21, 2017

Dr. Robert Gerardi, Jr., Superintendent
Maynard Public Schools
3-R Tiger Drive
Maynard, MA 01754

Re: Intake #17-0928

Student Name: ▓▓▓▓▓▓▓▓▓▓

**Closure Letter**

Dear Dr. Gerardi:

On May 30, 2017, the Massachusetts Department of Elementary and Secondary Education ("Department") received a written statement of concern from Mrs. ▓▓▓▓▓▓▓▓ and then her Attorney Tiffany E. Haines ("advocate") involving the Maynard Public Schools ("District"). As the Problem Resolution System ("PRS") Office Specialist inquiring into this matter, I have taken the following steps:

- Reviewed the statement of concern and supporting documentation;
- Requested a Local Report ("Report") from the District;
- Reviewed the District's Local Report and supporting documentation received by the Department on June 22, 2017;
- Reviewed the complainant advocate's response to the Local Report and additional documentation from the complainant's advocate;
- Sent an Extension Letter on July 28, 2017 at request of the complainant's advocate;
- Reviewed additional Local Report information received from the District on August 10, 2017;
- Reviewed the complainant advocate's response to the District's additional information to the Local Report;
- Reviewed relevant state and federal education laws and regulations;
- Consulted with other Problem Resolution System Office staff

The complainant's concern(s) and the findings of our investigation are summarized as follows:

1

## CONCERNS AND FINDINGS

The Department requested that you report on the following particular concern:

1. The complainant alleged that for the past two years the student ("alleged target") has been abused, intimidated, humiliated and bullied at Green Meadow School by both students and teachers ("alleged aggressors"). The complainant alleged that the issues were not addressed and that reports or investigations were not filed.

The Department investigated the complainant's bullying allegation under the state's bullying prevention and intervention law, M.G.L. c. 71, § 37O (as added by Chapter 92 of the Acts of 2010). The law prohibits bullying on school grounds; on adjacent property; and in a non-school related location, or through the use of technology, if it infringes on the rights of the target at school, or materially and substantially disrupts the education process or the orderly operation of the school. See M.G.L. c. 71, § 37O(b). All schools and districts are required by this law to adopt bullying prevention and intervention measures. This includes, among other things, procedures for receiving reports of bullying and retaliation; promptly investigating and responding to them; notifying parents of targets and aggressors of the results of investigations and, if bullying is found to have occurred, of actions taken to prevent further acts; and restoring a sense of safety for the target of bullying.

The Department investigated whether the District followed its bullying policy based on the following criteria:

1. ***Has the District developed required procedures regarding bullying and retaliation?***
   The District has a Bullying Prevention and Intervention Plan that is consistent with ESE requirements.

2. ***Was the report of bullying received and responded to promptly?***
   The District's initial Local Report and additional information completed per request of complainant's advocate indicated that the first report of bullying from the complainant was received on November 4, 2016 regarding an alleged aggressor in the EXCEL after-school program. The District indicated that there was inconclusive information to determine that the parent's concern rose to the level of bullying after reviewing a series of emails between the school staff and complainant parent that day, as well as an interview of the school staff member.

   The District's Report indicated a series of emails exchanged between the student's second grade teacher, school principal, and complainant parent (provided by the complainant's advocate) that occurred throughout the 2016-2017 school year and demonstrated continuous, prompt communications between the parties concerning the student, alleged aggressor behaviors and in turn, behaviors of the student.

On Thursday, May 17, 2017, the complainant stated in an email a specific incident that occurred on a field trip and that the student "had been choked" by another student. Communications were exchanged between the complainant and school staff. The student target failed to return to school the next day, being Friday, May 18, 2017, and complainant parent requested a meeting with the superintendent. An investigation began on Tuesday, May 23, 2017, after the meeting with the superintendent and the complainant's advocate regarding these concerns. A safety plan was agreed upon, but due to learning that the student was not a student of special education, the safety plan was subsequently deemed inappropriate. Individual tutoring was then offered by the District as a safety plan and implemented until the end of the school year for the student pending further investigation.

The Department's review indicates that in 2016-2017, the complainant raised concerns regarding both the student's interactions with some classmates and school staff and that the student may be the target of bullying. The Department's review shows that the District was responsive to these concerns. The Department therefore finds the District responded promptly to and investigated reports of alleged bullying. The District determined that the behaviors involved did not rise to the level of bullying. The Department notes that such determinations as to the District's outcomes as to whether or not bullying occurred are not part of the complaint process investigation.

3. *Did the District conduct an investigation into the allegations of bullying or retaliation?*
The District informed the complainant of the determination of its initial investigation via letter dated June 29, 2017, and on August 10, 2017 of its re-investigation into the allegations as agreed upon between the parties, again finding the same results of no bullying determinations. It is the Department's conclusion that the District investigated and addressed the concerns and allegations of bullying reported by the parent.

4. *Was a determination made regarding whether bullying had occurred and whether law enforcement agency notification was necessary?*
Based on its investigations into this matter conducted in May and June 2017, the District determined that bullying of the student had not occurred. A report to law enforcement was therefore unnecessary in this matter.

5. *Pursuant to its finding that bullying did not occur in this case, the District notified parents of that result by email and by letter.*
The Department's review of the documentation shows that the District communicated with the parent regarding its bullying determination.

The Department notes that the District offered for a full-time paraprofessional to accompany the student and monitor all interactions for safety throughout the day during the pendancy of

the full investigatory process. When the student stopped attending school, the District implemented individual tutoring for the student to complete the 2016-2017 school year. Additionally, the District has made arrangements for specific actions to be taken at the start of the 2017-2018 school year to ensure the student's ability to attend grade 3, including a class away from alleged aggressors and to establish a connection with the school adjustment counselor who would be available to this student.

Based on the information gathered, my inquiries indicate that no violation of education law, regulation or policy has occurred with regard to the specific concern(s) raised. The Department has closed this complaint as of August 21, 2017.

While the Department does not consider appeals of its decisions involving alleged noncompliance with state or federal education laws or regulations, should this summary of information be inaccurate in some way, please contact me at (781) 338-3747.

You may contact the Department again if you have additional questions.

Sincerely,

Joel Krakow, PRS Specialist
Problem Resolution System Office

cc:     Tiffany E. Haines, Esq., Advocate on behalf of Complainant
        Donna Dankner, Principal, Green Meadow School

4

# EXHIBIT F

**The Commonwealth of Massachusetts**
**Commission Against Discrimination**
484 Main Street, Room 320 , Worcester, MA 01608
Phone: (508) 453-9630 Fax: (508) 755-3861

MCAD DOCKET NUMBER: 17WPA02168
FILING DATE: 09/08/17

EEOC/HUD CHARGE NUMBER:
VIOLATION DATE: 08/24/17

Name of Aggrieved Person or Organization:

RECEIVED

Primary Phone: (978)

Named is the employer, labor organization, employment agency, or state/local government agency who discriminated against me:
Department of Elementary and Secondary Education
Attn: Human Resources/ Legal Department
75 Pleasant St
Malden, MA 02148
Primary Phone: (781)338-3000 ext. ____

No. of Employees:      20 +

Cause of Discrimination based on:
National Origin

The particulars are:
I, _____ o/b/o minor child, the Complainant believe that I was discriminated against by Department of Elementary and Secondary Education, on the basis of National Origin _____ This is in violation of M.G.L. c. 272 Section 98.

1.   I am _____ and my daughter is too.
2.   At the times of the events stated herein, I filed a complaint of discrimination and bullying, based on my daughter's national origin _____ with Respondent, which is open to, and accepts of solicits, the patronage of the general public.
3.   On or around May 29, 2017, I filed a complaint of discrimination and bullying on behalf of my daughter against her school district, which is overseen by Respondent, with JK, Problem Resolution Specialist. At the time of filing, I submitted additional evidence and documentation such as emails. However, Respondent never contacted me for anything involving the investigation or for additional information. Respondent just contacted us for procedural matters such as my preferred language. Respondent's regulations/policies state that that a decision would be made within 60 days of the date of filing.
4.   On or around June 29, 2017, our daughter's principal contacted us and said that the schools investigation was closed and said that no bullying or discrimination took place. After this, we retained counsel and the school subsequently, reopened the investigation.
5.   On or around July 29, 2017, PT (American), Problem Resolution Supervisor, contacted my attorney and said that Respondent needed a 30 day extension so that my daughter's school could have more time to conduct the investigation. However, this date was near the start of school, so we compromised on August 11, 2017. However, the investigation was supposed to be finished on July 29, 2017, as stated in Respondent's policies/regulations.
6.   On or around August 10, 2017, we received a final report from my daughter's school district stating that bullying and discrimination did not take place.
7.   On or around August 11, 2017, we did not hear or receive anything from Respondent.
8.   On or around August 14, 2017, JK called our attorney asking if I wanted to respond to the school's district's final report before Respondent issued a final decision. We filed a response detailing how certain issues and incidents of bullying were missed, as well as other problems with the investigation.  A date of August 22, 2017, was set for Respondent to issue a final decision.
9.   On or around August 24, 2017, we received Respondent's final decision, dated August 21, 2017, stating there was no violation of the law and the case was closed.

11.     Upon information and belief, another mother (American) filed a complaint with Respondent and she received a favorable decision, regarding her child being transferred and having the transfer paid for. Also, she received the decision within 60 days.

Therefore, I believe Respondent discriminated against me in a place of public accommodation based on national origin ~~and~~ regarding a fair investigation.

---

I hereby verify, under the pains and penalties of perjury, that I have read this complaint and the allegations contained herein are true to the best of my knowledge.

(Signature of Complainant)

# EXHIBIT G



UNITED STATES DEPARTMENT OF EDUCATION
OFFICE FOR CIVIL RIGHTS, REGION I
5 POST OFFICE SQUARE, 8th FLOOR
BOSTON, MASSACHUSETTS 02109-3921

November 28, 2017

By email:

Re:     Complaint No. 01-17-1340
        Maynard Public Schools

        Complaint No. 01-17-1368
        Massachusetts Department of Elementary and Secondary Education

Dear :

This letter is to notify you that the U.S. Department of Education, Office for Civil Rights (OCR) is opening for investigation one allegation that you filed in the above-referenced complaint against Maynard Public Schools (the District), and is dismissing the complaint you filed against the Massachusetts Department of Elementary and Secondary Education (DESE). OCR's explanation for these decisions is below.

OCR enforces Title VI of the Civil Rights Act of 1964 (Title VI) and its implementing regulation at 34 C.F.R. Part 100, which prohibit discrimination on the basis of race, color, or national origin in programs and activities that receive federal financial assistance from the U.S. Department of Education. Because the District receives federal financial assistance from the U.S. Department of Education, OCR has jurisdiction over it pursuant to Title VI.

In late September through early October 2017, OCR corresponded with you to obtain further information about your allegations, as necessary to continue with our evaluation. Among other information, OCR reviewed the resolution materials for comparable allegations you filed with the DESE division Program Quality Assurance (PQA), including your original complaint and supporting materials; correspondence from the District (e.g., internal investigative findings dated June and August 2017) and your attorney's response (dated August 2017); and PQA's ultimate disposition of your complaint (dated August 2017). OCR also reviewed your responses to OCR's inquiries regarding your complaint allegations.

Complaint No. 01-17-1340 (District)

Based on this review, OCR is opening one allegation from your complaint: that a teacher (Teacher) discriminated against the Student when the Teacher read an email from you in front of the Student's classmates regarding the Vernal Pools incident, which humiliated your daughter. You provided information to OCR alleging that the Teacher has never done anything comparable to other students, and that her conduct was inconsistent with her usual practice of having private conversations with students. OCR has determined that it has jurisdiction over this allegation and that it was timely filed; therefore, OCR will investigate the following issue:

*The Department of Education's mission is to promote student achievement and preparation for global competitiveness by fostering educational excellence and ensuring equal access.*

- Whether the District discriminated against the Student on the basis of national origin when the Teacher read aloud an email from Complainant regarding a physical altercation involving the Student on a field trip, in violation of 34 C.F.R. § 100.3(b).

Please note that opening the complaint for investigation in no way implies that OCR has made a determination on the merits of the complaint. During the investigation, OCR is a neutral fact-finder, collecting and analyzing relevant evidence from the Complainant, the District, and other sources, as appropriate. OCR will ensure that its investigation is legally sufficient and fully responds to the complaint in accordance with the provisions of the *Case Processing Manual*, available at http://www.ed.gov/ocr/docs/ocrcpm.pdf.

After careful evaluation, OCR is dismissing your other complaint allegations because we have determined that they were already investigated and resolved by the District and/or PQA, consistent with our Case Processing Manual at Section 110(a). To the extent you raised additional allegations that were not expressly addressed in these resolution materials (e.g., ineffective response to bus incident(s) from winter 2017), OCR has insufficient information to infer that discrimination occurred. Specifically, you clarified to OCR that you were not alleging that students were targeting the Student on the basis of national origin; instead, you protested the District's allegedly ineffective response due to your family's national origin (e.g., no response; formal bullying reports were not issued). However, OCR is unable to infer national origin discrimination from the information you provided. OCR made this determination after reviewing the PQA resolution, which found that the District responded appropriately to your concerns regarding other students and school staff, specifically:

> *The Department's review indicates that in 2016-2017, the complainant raised concerns regarding both the student's interactions with some classmates and school staff and that the student may be the target of bullying. The Department's review shows that the District was responsive to these concerns. The Department therefore finds the District responded promptly to and investigated reports of alleged bullying.*

OCR also made this determination after reviewing your correspondence with District staff (enclosed in your PQA complaint), where staff appear to have responded to the concerns raised even if not to your satisfaction. (OCR also notes that PQA characterized the District's communications with you as having "demonstrated continuous, prompt communications between the parties concerning the student, alleged aggressor behaviors and in turn, behaviors of the student.") Finally, OCR notes the lack of information suggesting that your family was treated differently from comparably-situated families[1] and/or that the District's allegedly ineffective responses were motivated by national origin. In other words, separate and apart from PQA's resolution of most if not all of your OCR allegations, OCR has concluded that your allegations of

---

[1] OCR notes that you submitted an anecdote from a family who was pleased with the District's response to an incident; however, this information does not provide a sufficient basis to infer discrimination in your case because (1) the family's child is on an IEP, and anti-disability discrimination laws may have different response requirements; and (2) the District's response to that family was comparable to the District's response to at least several complaints you raised, as illustrated by the correspondence you submitted with the PQA complaint, e.g., immediate response to "slapping" incident in bus line.

Page 3 – OCR Complaint No. 01-17-1340

discrimination based on national origin are ultimately speculative and otherwise insufficient for us to infer a violation of our laws.

Complaint No. 01-17-1368 (DESE)
OCR is also dismissing your allegation that DESE mishandled your complaint by, for example, exceeding its internal deadlines or making inappropriate findings of fact and law, because these allegations, even if true, do not state a violation of our laws.

* * *

OCR's goal is the prompt, appropriate resolution of the complaint. While we are proceeding with an investigation, there are other approaches that can achieve this goal. Information on OCR's complaint processing procedures is available at http://www.ed.gov/ocr/complaints-how.html. In particular, please note the section on Early Complaint Resolution (ECR). Under this voluntary, informal approach, similar to mediation, OCR helps facilitate settlement discussions between you and the District. At your earliest convenience, please consider and notify OCR whether you are interested in this resolution option.

Please be advised that the District must not harass, coerce, intimidate, discriminate, or otherwise retaliate against an individual because that individual asserts a right or privilege under a law enforced by OCR or files a complaint, testifies, assists, or participates in a proceeding under a law enforced by OCR. If this happens, the individual may file a retaliation complaint with OCR.

Under the Freedom of Information Act, it may be necessary to release this document and related correspondence and records upon request. If OCR receives such a request, we will seek to protect personally identifiable information that could reasonably be expected to constitute an unwarranted invasion of personal privacy if released, to the extent provided by law

If you have any questions, you may contact me at (617) 289-0067 or by e-mail at Ramzi.Ajami@ed.gov.

Sincerely,

Ramzi Ajami
Compliance Team Leader